**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**SHAGHAYEGH MIRSHAHI, M.D.,**

      **Plaintiff,**

   **v.**                                **Civil Action No. 3:23cv495**

**PATIENT FIRST RICHMOND MEDICAL**
**GROUP, LLC,** *et al.,*

      **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendants Patient First Richmond Medical

Group, LLC ("Patient First"), Dr. W. Kent Schuele, and Jennifer Cericola's Partial Motion to

Dismiss and Motion to Strike (the "Motion to Dismiss"). (ECF No. 11.)[1] Defendants filed a

separate Motion for Hearing on Defendants' Dispositive Motion. (ECF No. 17.) Defendants

seek to dismiss three of the five counts at bar. Plaintiff Shaghayegh Mirshahi submitted a

Memorandum in Opposition to the Motion to Dismiss and Defendants replied. (ECF Nos.

18, 19.)

The matters are ripe for disposition. The Court dispenses with oral argument because the

materials before it adequately present the facts and legal contentions, and argument would not

aid the decisional process. Accordingly, the Court will deny the Motion for Hearing. (ECF

No. 17.) For the reasons that follow, the Court will grant the Motion to Dismiss. (ECF No. 11.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

## I. Factual and Procedural Background

### A.    Summary of Relevant Allegations in the First Amended Complaint[2]

Plaintiff Dr. Shaghayegh Mirshahi is a physician and a "female of Iranian heritage with a brown complexion." (ECF No. 6 ¶ 109.) "Defendant Patient First is a Henrico County-based healthcare company that specializes in providing urgent care, primary care, and walk-in care to patients." (ECF No. 6 ¶ 7.) Defendant Dr. W. Kent Schuele is "a white, tall, middle-aged man." (ECF No. 6 ¶ 53.) He serves as the Medical Director of Patient First's facility located at 332 Newtown Road, Virginia Beach, Virginia (the "Clinic"). (ECF No. 6 ¶¶ 7–8.) Dr. Schuele also served as Dr. Mirshahi's direct supervisor during her employment with Patient First. (ECF No. 6 ¶ 22.) Defendant Nurse Jennifer Cericola serves as the Clinic's Director of Medical Support. (ECF No. 6 ¶ 9.) In December 2018, Dr. Mirshahi began working at the Clinic as an Attending Physician. (ECF No. 6 ¶¶ 7, 12.)

The Court recounts only the factual allegations that it deems relevant to the instant Motion to Dismiss. (ECF No. 11.)

### 1.    Dr. Mirshahi's Complaints about Allegedly Being Asked to "See Patients" While Awaiting COVID-19 Rapid-Test Results

In mid-July 2021, Dr. Mirshahi was "worn down due to her grueling work schedule" and an "overwhelming" patient load. (ECF No. 6 ¶ 54.) On the morning of July 13, 2021, after having left work at approximately 2:00 A.M. the night before, Dr. Mirshahi "slept through her alarm and . . . awoke [only] after she received repeated calls from her facility," by which time

---

[2] In considering the Motion to Dismiss, the Court will assume the well-pleaded factual allegations in the First Amended Complaint to be true and will view them in the light most favorable to Dr. Mirshahi. *See Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Republican Party of N.C. v. Martin*, 7 F.3d 1130, 1134 (4th Cir. 1992).

she was late reporting for work.  (ECF No. 6 ¶¶ 56–57.)  When she arose, "she was dizzy and had a stomachache, nausea, and a headache."  (ECF No. 6 ¶ 57.)

Dr. Mirshahi "was reasonably concerned she might have COVID-19" because her mother recently had COVID-19 and Dr. Mirshahi had been around her; and because she was "very symptomatic," meaning "she could not make any sudden moves or she would have become dizzy and fainted." (ECF No. 6 ¶ 58.)  She arrived at the Clinic and immediately self-administered a COVID-19 rapid test.  (ECF No. 6 ¶ 58.)  Given Dr. Mirshahi's reported symptoms, Patient First contacted a replacement for her.  (ECF No. 6 ¶ 59.)  However, while Dr. Mirshahi awaited her test results, "Nurse Cericola, who had apparently just spoken by phone to Dr. Schuele, told Dr. Mirshahi that Dr. Schuele said she needed to 'Get up and go see patients until your replacement comes in!'" (ECF No. 6 ¶ 60.)  Dr. Mirshahi refused to see patients that day.  (ECF No. 6 ¶ 63.)  Nurse Cericola "bad-mouthed" her while she waited in the patient room for her test results, telling coworkers that "[Dr. Mirshahi] is not sick . . . she's pretending."  (ECF No. 6 ¶ 61 (emphasis omitted).)

Dr. Mirshahi's July 13, 2021 COVID-19 test result was negative.  (ECF No. 6 ¶ 62.)  Nevertheless, she asserts that because of her symptoms, seeing patients that day would have:

- "violat[ed] . . . Patient First's own COVID-19 guidelines," (ECF No. 6 ¶ 64);

- "violated the COVID-19 guidelines set forth by the Virginia Department of Health ('VDH') and the CDC," (ECF No. 6 ¶ 65);

- constituted medical "misconduct" under Va. Code Ann. § 54.1-2915(A)(3), (12)–(13), (ECF No. 6 ¶ 67);

- "constitute[d] a criminal assault under Virginia state law," (ECF No. 6 ¶ 68); and,

- "qualifie[d] as terrorism under federal law," (ECF No. 6 ¶ 68 (citing 18 U.S.C. §§ 1038, 2332a)).

3

Dr. Mirshahi left the Clinic due to her symptoms, and soon after she arrived home, Dr.
Schuele began texting her with questions concerning her eventual return to work. (ECF No. 6
¶ 69.) After a brief exchange of text messages with Dr. Schuele, Dr. Mirshahi ultimately "called
Dr. Schuele and told him that his words and actions were inappropriate given her sick condition,
and she asked him not to contact her again for the day." (ECF No. 6 ¶¶ 70–71.) She then
emailed both Patient First headquarters and its regional physician manger, Dr. Desai, to report
Dr. Schuele's and Nurse Cericola's asking her to work "after she had been tested for
COVID-19," and she texted Dr. Desai, writing, "It is called Patient First. Today I was a patient. I
was not put first . . . [.] There is something fundamentally wrong with you all." (ECF No. 6 ¶¶
71–72 (emphasis omitted).)

Dr. Mirshahi later took a COVID-19 PCR test that yielded another negative result. (ECF
No. 6 ¶ 73.) She concedes that she did not have COVID-19 on July 13, 2021. (*See* ECF No. 18,
at 2.)

### 2.   Patient First Terminates Dr. Mirshahi's Employment

Although Dr. Mirshahi tested negative for COVID-19 on both a rapid test and a PCR
assay, she did not return to the Clinic until July 25, 2021, which was "in accordance with CDC
and Patient First guidance."[3] (ECF No. 6 ¶¶ 62, 73–74.) Dr. Mirshahi worked several shifts
between July 25 and July 28, 2021. (ECF No. 6 ¶ 74.) On July 28, 2021, Dr. Schuele and Dr.
Desai met in person with Dr. Mirshahi to inform her that "Patient First had decided to terminate
her contract." (ECF No. 6 ¶¶ 75–76.) When she asked why, Drs. Schuele and Desai gave her
several reasons, "none of which were true." (ECF No. 6 ¶¶ 77–78.) These included that she

---

[3] Dr. Mirshahi states that she "stayed absent from the facility for ten days." (ECF No. 6
¶ 74.) However, her July 25 return to work occurred twelve days after she began her sick leave
on July 13, meaning she was absent for some part of July 13 and then for eleven full days after.

4

"was not a 'good fit'" and that she had "numerous patient complaints." (ECF No. 6 ¶ 78.)  Dr. Mirshahi claims she "easily refuted" the second justification "by asking whether the complaints were 'subjective' (e.g., racist) or 'objective' (i.e., she provided bad medical advice or committed medical malpractice)." (ECF No. 6 ¶ 78.)  Drs. Schuele and Desai told Dr. Mirshahi that as an at-will employee, she "could be fired for any reason." (ECF No. 6 ¶ 78.)  Finally, Dr. Mirshahi asked about Dr. Schuele's July 13 directive to "see patients" until her replacement arrived, to which Dr. Schuele responded that he "probably wouldn't have asked [Dr. Mirshahi] to do that if [he] had known [her] mother was sick."[4]  (ECF No. 6 ¶ 79 (alterations in original).)

### 3. Dr. Mirshahi's Complaints about Patient First "Seeking to Make Her Look Bad"

Dr. Mirshahi contends that "behind the scenes, [Patient First] was actively seeking to make her look bad," citing an incident in which Nurse Cericola altered a patient complaint "to specifically disparage" Dr. Mirshahi.  (ECF No. 6 ¶¶ 85–86.)  A disgruntled patient lodged an

---

[4] Under "Factual Background" in the First Amended Complaint, Subsection D's heading alleges that Patient First fired Dr. Mirshahi "[b]ecause [s]he [c]omplained [a]bout [b]eing [t]old [t]o [s]ee [p]atients [w]hile [s]ymptomatic." (ECF No. 6, at 16.)  Within this subsection, however, Dr. Mirshahi never alleges that any person communicated to her, expressly or implicitly, that her response to that directive motivated Patient First's decision to fire her. (*See* ECF No. 6 ¶¶ 73–80.)  Although Dr. Mirshahi claims that, at the time of her firing, Dr. Schuele discussed his giving the command, (ECF No. 6 ¶ 79), she does not assert that Drs. Schuele or Desai condemned or even mentioned her response to the directive, (*see* ECF No 6. ¶¶ 73–80).

Patient First distributes "written medical handouts to its patients based on their medical condition(s)." (ECF No. 6 ¶ 13.)  In mid-2020, motivated by a desire to improve patients' compliance with medical guidance and by patient feedback concerning the readability of Patient First's handouts, Dr. Mirshahi began creating and distributing her own written medical handouts. (ECF No. 6 ¶¶ 14–18.)  Patient First eventually directed Dr. Mirshahi to stop using her own handouts, and she "immediately complied." (ECF No. 6 ¶¶ 23, 29.)  After her termination, when Dr. Mirshahi pressed Patient First for an explanation of the cause for her termination, Patient First's physician relations corporate administrator told her "that she had been terminated because she had 'openly refused' to follow Patient First's instructions about handouts and had been the subject of discipline related to the handouts.'" (ECF No. 6 ¶¶ 81–82.)

oral complaint against both Dr. Mirshahi and a physician's assistant after they refused the patient's request for antibiotics, but Nurse Cericola incorrectly transcribed the complaint to implicate only Dr. Mirshahi.  (ECF No. 6 ¶¶ 86–88.)  Nurse Cericola did not amend the report after another employee attempted to correct her, and even exclaimed, "Another complaint for Dr. Mirshahi . . . a few more and she's outta here!"  (ECF No. 6 ¶¶ 89–90.)

### B.   Procedural History

On August 7, 2023, Dr. Mirshahi filed a Complaint, (ECF No. 1), which named Patient First as the sole defendant and included only two counts, both of which concerned discrimination based on color, sex, and national origin.  (*See* ECF No. 1 ¶¶ 6, 17–28.)

On November 17, 2023, before any defendant had filed an answer or otherwise replied, Dr. Mirshahi properly filed a five-count First Amended Complaint, (ECF No. 6), adding Dr. Schuele and Nurse Cericola as defendants and bringing the following causes of action:

**Count I:**     *Bowman* Claim[5] (against Patient First and Dr. Schuele)

**Count II:**    Virginia Whistleblower Protection Act ("VWPA") Claim[6] (against Patient First)

---

[5] "*Bowman* Claim" refers to *Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985). (ECF No. 6, at 20 n.5.)  *Bowman* established a "narrow exception" to Virginia's at-will employment doctrine, holding that an at-will employee's discharge is wrongful when it occurs "in violation of an established public policy." 331 S.E.2d at 801.

Here, Dr. Mirshahi alleges that when Patient First and Dr. Schuele terminated her employment, they violated Virginia public policies, "including but not limited to Va. Code [Ann. §] 54.1-2915(A)(3), (12)[–](13) (defining acts of 'unprofessional conduct' and disciplinary conduct for a Virginia physician) and Va. Code [Ann.] § 18.2-57 (assault and battery)." (ECF No. 6 ¶ 98.)

[6] The VWPA is codified at Va. Code Ann. § 40.1-27.  In Count II, Dr. Mirshahi cites "§ 40.1-27.3(A)(1),(*2*) & (*3*)," (ECF No. 6 104 (emphasis added)), but based upon the language that Dr. Mirshahi quotes, the Court surmises that she intended to cite § 40.1-27.3(A)(1) & (*3*)–(*4*). The statute provides, in relevant part:

**Count III:**    Title VII Discrimination Claim[7] (Color, Sex, and National Origin) (against Patient First)

**Count IV:**    VHRA Discrimination Claim[8] (Color, Sex, and National Origin) (against Patient First)

**Count V:**    Defamation[9] (against Nurse Cericola and Patient First)

(ECF No. 6 ¶¶ 97–127.)

On January 23, 2024, Defendants Patient First, Nurse Cericola, and Dr. Schuele moved to dismiss Counts I, II, and V and, in the alternative, to strike certain damages under Count II.

---

A. An employer shall not discharge, discipline, threaten, discriminate against, or penalize and employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee:

> 1. . . . [R]eports a violation of any federal or state law or regulation to a supervisor . . . ;
>
> 2. Is requested by a governmental body or law-enforcement official to participate in an investigation, hearing, or inquiry;
>
> 3. Refuses to engage in a criminal act that would subject the employee to criminal liability; [or]
>
> 4. Refuses an employer's order to perform an action that violates any federal or state law or regulation and the employee informs the employer that the order is being refused for that reason[.]

Va. Code Ann. § 40.1-27.3(A)(1)–(4).

[7] Although Dr. Mirshahi does not further specify which statute this allegation invokes, (*see* ECF No. 6), the Court construes the referenced statute as Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* In her First Amended Complaint, Dr. Mirshahi quotes, but does not fully cite, 42 U.S.C. §2000e-2(a)(1). (*See* ECF No. 6 ¶ 110.)

[8] "VHRA" refers to the Virginia Human Rights Act, Va. Code Ann. § 2.2-3900, *et seq.*

[9] Dr. Mirshahi cites no statutes or caselaw for Count V.

7

(ECF No. 11, at 1.)  Defendants contend that Dr. Mirshahi "fail[s] to state any claim upon which relief can be granted" for her claims in Counts I, II, and V.  (ECF No. 11, at 2.)

On February 7, Defendants filed a Motion for Hearing on Defendants' Dispositive Motion. (ECF No. 17).  After requesting and receiving an extension of time to file a response, (ECF Nos. 15–16), on February 13, 2024, Dr. Mirshahi responded in opposition to the Motion to Dismiss, (ECF No. 18).  Defendants replied.  (ECF No. 19.)

The matter is ripe for disposition.  The Court will grant the Motion to Dismiss.  (ECF No. 11.)  Because the materials adequately present the facts and legal contentions, and argument would not aid the decisional process, the Court dispenses with oral argument.  Accordingly, the Court will deny the Motion for Hearing.  (ECF No. 17.)

## II.  Legal Standard:  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and

8

plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. At the motion to dismiss stage, the court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington Volunteer Fire Dept., Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'") (quoting *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III. Analysis

For the reasons articulated below, the Court will grant the Motion to Dismiss.

#### A.   The Court Will Grant the Motion to Dismiss Count I Because Dr. Mirshahi Has Not Stated a Viable *Bowman* Claim

Dr. Mirshahi claims that Patient First and Dr. Schuele wrongfully terminated her employment in violation of Virginia public policies, "including but not limited to" those found in

Va. Code § 54.1-2915(A)(3), (12)–(13)[10] (defining acts of 'unprofessional conduct' for a Virginia physician) and Va. Code § 18.2-57[11] (assault and battery). (ECF No. 6 ¶ 98.) These claims present an employee public policy ("Type 2") *Bowman* claim and a refusal to commit crime ("Type 3") *Bowman* claim, respectively. Defendants seek dismissal of both of Dr. Mirshahi's *Bowman* claims.

### 1. Legal Standard: Discharge of an Employee in Violation of Public Policy (*Bowman* Claim)

"Virginia adheres to a strong presumption that employment is at will, meaning employment lasts for an indefinite term and can be terminated for almost any reason." *Carmack v. Virginia*, No. 1:18-CV-00031, 2019 WL 1510333, at *9 (W.D. Va. Apr. 05, 2019) (citing *Lockhart v. Commonwealth Educ. Sys. Corp.*, 439 S.E.2d 328, 330 (Va. 1994)); *see also, e.g.*,

---

[10] Section 54.1-2915, which addresses unprofessional medical conduct, reads, in relevant part:

> A. The Board may refuse to issue a certificate or license to any applicant; reprimand any person; place any person on probation . . . ; impose a monetary penalty . . . ; suspend any license . . . ; or revoke any license for any of the following acts of unprofessional conduct:
>
> > 3. Intentional or negligent conduct in the practice of any branch of the healing arts that causes or is likely to cause injury to a patient or patients;
> > \*       \*       \*
> > 12. Conducting his [or her] practice in a manner contrary to the standards of ethics of his [or her] branch of the healing arts;
> >
> > 13. Conducting his [or her] practice in such a manner as to be a danger to the health and welfare of his [or her] patients or to the public[.]

Va. Code Ann. § 54.1-2916(A)(3), (12)–(13).

[11] Section 18.2-57 reads, in relevant part: "Any person who commits a simple assault or assault and battery is guilty of a Class 1 misdemeanor[.]" Va. Code Ann. § 18.2-57(A).

*Hice v. Mazzella Lifting Techs., Inc.*, 589 F. Supp. 3d 539, 550 (E.D. Va. 2022). "However, a

'*Bowman* claim' allows an at-will employee to bring a tortious wrongful discharge claim if the

termination violates Virginia public policy as expressed in a Virginia statute." *Hice*, 589 F.

Supp. 3d at 550 (citing *Bowman*, 331 S.E.2d at 801). Virginia courts expounding on *Bowman*

have "consistently characterized [the public policy] exception[ ] as 'narrow.'" *Williams v. TMS*

*Int'l, LLC*, No. 3:21-CV-260 (DJN), 2021 WL 4071868, at *4 (E.D. Va. Sept. 9, 2021) (internal

citations and quotations omitted) (alterations in original).

    The Supreme Court of Virginia has recognized three situations in which a discharged

employee may show that his or her discharge violated public policy: (1) where an employer

fired an employee for exercising a statutorily created right ("statutory right *Bowman* claim"); (2)

where the public policy is "explicitly expressed in the statute and the employee was clearly a

member of that class of persons directly entitled to the protection enunciated by the public

policy" ("employee public policy *Bowman* claim"); or, (3) "where the discharge was based on

the employee's refusal to engage in a criminal act" ("refusal to commit crime *Bowman* claim").

*Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 711 (Va. 2002) (same); *see also Hice*, 589 F.

Supp. 3d at 550–51; *Carmack*, 2019 WL 1510333, at *9 (same). In an employee public policy

*Bowman* claim, a plaintiff qualifies as a member of the class of persons protected by a statute

when "the statute imposed a duty on [the plaintiff] to perform the act that led to [the plaintiff's]

termination, or that [the plaintiff] would be the victim of a putative violation of that statute."

*Scates v. Shenandoah Mem'l Hosp.*, No. 5:15-CV-00032, 2015 WL 6143457, at *9 (W.D. Va.

Oct. 19, 2015) (citing *Anderson v. ITT Indus. Corp.*, 92 F. Supp. 2d 516, 522 (E.D. Va. 2000)).

2.  **Dr. Mirshahi's Type 2 *Bowman* Claim Fails Because Va. Code § 54.1-2915(A) Does Not "Explicitly Express" a Public Policy and Because Dr. Mirshahi Is Not Clearly a Member of the Class of Persons Protected By § 54.1-2915(A)**

Dr. Mirshahi's Type 2 *Bowman* claim fails because Va. Code § 54.1-2915(A), addressing unprofessional medical conduct, does not "explicitly express" a public policy and because, even if it did, Dr. Mirshahi is not "clearly a member of that class of persons directly entitled to the protection enunciated by the public policy." *See Rowan*, 559 S.E.2d at 711.

Dr. Mirshahi avers that on July 13, 2021, she experienced a stomachache, a headache, dizziness, and nausea. (ECF No. 6 ¶ 58.) Dr. Mirshahi acknowledges that she did not have COVID-19 but maintains that "she was still incredibly ill and symptomatic . . . and thus posed a medical risk to her patients." (ECF No. 18, at 7 (emphasis omitted).) Interpreting the facts and drawing all reasonable inferences in Dr. Mirshahi's favor, her symptoms indicated possible infection with a communicable disease. Furthermore, at the motion to dismiss stage, the Court will not discount Dr. Mirshahi's claim that treating patients while knowingly ill with a communicable disease could constitute either "[i]ntentional or negligent conduct in the practice of any branch of the healing arts" or "[c]onducting [her] practice in a manner contrary to the standards of ethics of [her] branch of the healing arts . . . [or] in such a manner as to be a danger to the health and welfare of [her] patients." *See* Va. Code § 54.1-2915(A)(3), (12)–(13). Nonetheless, Dr. Mirshahi's Type 2 *Bowman* claim fails because § 54.1-2915(A) does not provide a public policy foundation for a *Bowman* claim.

As the Supreme Court of Virginia has recognized, "virtually every statute expresses a public policy of some sort." *Rowan*, 559 S.E.2d at 711. However, the Supreme Court of Virginia has clarified that the *Bowman* doctrine's exception to the state's at-will employment norms is a narrow one. *See, e.g., id.*; *Bowman*, 331 S.E.2d at 801. Not just any statute affords an

12

exception to Virginia's at-will employment doctrine; a successful Type 2 *Bowman* claim must allege that the plaintiff was fired in violation of a statute "containing *explicit statements* of public policy (e.g.[,] 'It is the public policy of the Commonwealth of Virginia [that] . . .')", or in violation of a law that is "designed to protect the 'property rights, personal freedoms, health, safety, or welfare of the people in general.'" *City of Va. Beach v. Harris*, 523 S.E.2d 239, 245 (Va. 2000) (emphasis added) (citations and internal quotation marks omitted).

Dr. Mirshahi does not identify an explicit public policy underlying Va. Code § 54.1-2915(A), and this Court sees none. (*See* ECF No. 18, at 12.) Dr. Mirshahi instead argues that the Court should recognize § 54.1-2915(A) as a source of public policy because other jurisdictions "have easily recognized that state statutes which regulate medical professionals can serve as the 'public policy' basis for a public-policy-exception-based wrongful termination claim." (ECF No. 18, at 9–10.)

The cases that Dr. Mirshahi cites do not pertain because they discuss Missouri's public policy exception doctrine, which differs from Virginia's in a substantive way. (*See* ECF No. 18, at 9–10 (citing *Farrow v. St. Francis Med. Ctr.*, 407 S.W.3d 579 (Mo. 2013) (en banc); *Kirk v. Mercy Hosp. Tri-Cnty.*, 851 S.W.2d 617 (Mo. Ct. App. 1993)).) Unlike Virginia's *Bowman* exception, Missouri's similar doctrine does *not* require explicit expression of the underlying public policy. Instead, Missouri's public policy exception doctrine requires only that the public policy be based on an "explicit authority," such as "a constitutional provision, a statute, a regulation based on a statute, or a rule promulgated by a governmental body." *Compare Farrow*, 407 S.W.3d at 595 (Missouri explicitness standard) *with Harris*, 523 S.E.2d at 245 (explaining that the Virginia standard requires "explicitly expressed" public policy, such as "[i]t is the public policy of the Commonwealth of Virginia [that] . . . ," or else a law that is "designed to protect the

13

property rights, personal freedoms, health, safety, or welfare of the people in general"). Virginia's Type 2 *Bowman* exception is thus narrower than Missouri's corresponding public policy exception to the employment-at-will doctrine. Therefore, the fact that courts applying Missouri law might acknowledge an unwritten public policy does not mandate that courts applying Virginia law do the same.[12] The statute at issue here does not contain any explicit expression of public policy but merely describes the authority of the state medical licensing board. *See* Va. Code § 54.1-2915(A); *Harris*, 523 S.E.2d at 246 (plaintiff could not base a Type 2 *Bowman* claim on a statute that "did not state any public policy but merely described the powers and duties of a police force").

Further, Virginia's § 54.1-2915 does not constitute a law "designed to protect the 'property rights, personal freedoms, health, safety, or welfare of the people in general.'" *See Harris*, 523 S.E.2d at 245 (citations and internal quotation marks omitted); *Scates*, 2015 WL 6143457, at *9 ("[N]o court has ever applied § 54.1-2915(A) to support a wrongful termination claim under this theory."). Statutes that merely provide a regulatory mechanism but do not provide the public with any statutory rights or impose affirmative duties cannot provide the foundation for a Type 2 *Bowman* claim. *See, e.g., Harris*, 523 S.E.2d at 246 (rejecting as a public policy basis for a Type 2 *Bowman* claim a statute that "merely described the powers and

---

[12] Moreover, the Missouri statute at issue in *Farrow*, 297 S.W.3d, and *Kirk*, 851, S.W.2d, differs materially from Va. Code § 54.1-2915(A). Missouri's Nursing Practice Act ("NPA") establishes affirmative mandates for the regulation of medical providers. *See Kirk*, 851 S.W.2d at 621 (observing that the NPA "*requires* the [Missouri State] Board [of Nursing] to set minimum standards" and provides that "the Board *shall* '[c]ause the prosecution of all persons violating provisions of [the NPA]'" (emphasis added) (last two alterations in original)).

In contrast, Va. Code § 54.1-2915(A) is precatory. It does not *itself* regulate medical professionals or create any affirmative duties; it merely grants the state medical board the *authority* to take action in certain situations if the Board so chooses. *See* Va. Code § 54.1-2915(A) ("The Board *may* refuse to issue a certificate . . . ." (emphasis added)).

duties of a police force"); *Moschetti v. Off. of the Inspector Gen.*, No. 3:22cv24 (HEH), 2022 WL 3329926, at *9 n.13 (E.D. Va. Aug. 11, 2022) (rejecting as policy bases for a Type 2 *Bowman* claim, *inter alia*, a statute that imbued the Probation and Parole Board with powers and duties but did not create any rights and a statute that outlined the powers and duties of the Inspector General). Here too, the statute provides the general public with no rights or remedies and merely authorizes the Virginia Board of Medicine to regulate instances of unprofessional conduct by licensed healthcare providers. *See Scates*, 2015 WL 6143457, at *9. The Court's conclusion is bolstered by the fact that "no court has *ever* applied § 54.1-2915(A) to support a wrongful termination claim," including on the theory that the statute "represents an established public policy to protect the general public." *See Scates*, 2015 WL 6143457, at *10 (emphasis added). This Court sees no basis to be the first, especially because Dr. Mirshahi's Type 2 *Bowman* claim would fail anyway for the reasons discussed below.

Even if § 54.1-2915(A) explicitly stated a public policy, which it does not, Dr. Mirshahi's employee public policy *Bowman* claim still would fail because she is not "clearly a member of that class of persons directly entitled to the protection enunciated by the public policy." *See Rowan*, 559 S.E.2d at 711. Dr. Mirshahi wrongly contends that she is part of the class of individuals protected by Va. Code § 54.1-2916(A) because that statute "imposes an affirmative and personal duty upon a health practitioner such as Dr. Mirshahi." (ECF No. 18, at 10.) As discussed above, the Virginia statute does not create an affirmative duty for *any* entity. The statute neither compels the board to act nor imposes any restrictions or duties on medical providers directly. *See* Va. Code § 54.1-2915(A). It merely permits the state medical board to take certain disciplinary actions. *See id.* Further, Dr. Mirshahi would not be the "victim" of a violation of § 54.1-2915(A), because the medical regulatory statute aims to protect patients from

15

unprofessional conduct of practitioners of the healing arts, rather than to protect the practitioners themselves. *See Scates*, 2015 WL 6143457, at *10 (ultrasound technician "could never be the 'victim' of any violation of § 54.1-2915(A)(12) or (A)(13)" so could not be "a member of the class of persons the statute was meant to protect").

Because Va. Code § 54.1-2915(A) does not explicitly express a public policy and because Dr. Mirshahi is not "clearly a member of that class of persons directly entitled to the protection enunciated by the public policy," *see Rowan*, 559 S.E.2d at 711, the Court will dismiss Dr. Mirshahi's Type 2 *Bowman* claim.

### 3. Dr. Mirshahi's Type 3 *Bowman* Claim Fails Because the Virginia Whistleblower Protection Act Preempts Type 3 *Bowman* Claims

Dr. Mirshahi next asserts a Type 3 *Bowman* claim on the basis that heeding the Defendants' instructions to "go see patients" while symptomatically ill would have subjected her to criminal prosecution.[13] This claim fails because the Virginia Whistleblower Protection Act ("VWPA")[14] preempts Type 3 *Bowman* claims and because, even if it did not, the instructions given did not ask her to commit a criminal act.

---

[13] Dr. Mirshahi alleges that seeing patients while ill would subject her to criminal prosecution for "assaulting her patients and/or violating federal criminal law." (ECF No. 6 ¶ 105.) The Court addresses these arguments in its discussion of the Virginia Whistleblower Protection Act claim in Part III.B., *infra*.

[14] The VWPA states, in pertinent part:

A person who alleges a violation of this section may bring a civil action in a court of competent jurisdiction within one year of the employer's prohibited retaliatory action. The court may order as a remedy to the employee (i) an injunction to restrain continued violation of this section, (ii) the reinstatement of the employee to the same position held before the retaliatory action or to an equivalent position, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs.

Va. Code § 40.1-27.3(C).

Defendants argue that, although *Bowman* claims previously encompassed terminations for refusal to engage in a criminal act, the VWPA now provides the exclusive remedy for employees terminated for their refusal to engage in a criminal act—meaning that the VWPA preempts Type 3 *Bowman* claims. (ECF No. 12, at 14–16.) In response, Dr. Mirshahi cites *Chenault v. RBI Corporation*, a case from the Circuit Court for the County of Hanover, which concluded that although the VWPA "specifies a remedy, there is nothing to indicate it provides the exclusive remedy" for terminations due to a refusal to engage in a criminal act. (ECF No. 18, at 12–13); 108 Va. Cir. 529, 2021 WL 8776245, at *4 (Va. Cir. 2021). Notwithstanding *Chenault*, the majority of courts that have considered the question have, in this Court's estimation, correctly concluded that the VWPA preempts a Type 3 *Bowman* claim.

"The Supreme Court of Virginia has long held that 'where a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise.'" *Williams*, 2021 WL 4071868, at *5 (quoting *Sch. Bd. v. Giannoutsos*, 380 S.E.2d 647, 649 (Va. 1989)). Accordingly, "[n]umerous Virginia courts have found that 'statutes containing their own remedy cannot also support a *Bowman* claim.'" *Vinson v. City of Richmond*, No. 3:22cv698 (MHL), 2023 WL 4850172, at *9 (E.D. Va. July 28, 2023) (citations and internal quotation marks omitted) (discussing interaction of *Bowman* and the Virginia Human Rights Act); *see also Carmack*, 2019 WL 1510333, at *13 ("If the termination is in violation of stated public policy, the law does not permit the aggrieved employee to pursue a common law remedy when a statutory remedy is clearly enunciated." (citations and internal quotation marks omitted)) (collecting cases);[15] *Williams*, 2021 WL 4071868, at *5 (same).

---

[15] These collected cases involve *Bowman* claims under statutory schemes other than the VWPA and VHRA. *See Hice* 589 F. Supp. 3d at 553. But this Court agrees with the *Hice* court that these cases nonetheless constitute "persuasive precedent" because they "support[] that the

Here, Dr. Mirshahi brings a VWPA claim as Count II. The VWPA creates a private right of action, providing that "[a] person who alleges a violation of this section may bring a civil action in a court of competent jurisdiction[.]" Va. Code § 40.1-27.3(C). The VWPA further provides that "[t]he court may order as a remedy" (i) an injunction, (ii) reinstatement, and (iii) compensation. *Id.* Because the VWPA creates a cause of action and provides its own remedy, it cannot support a common law *Bowman* claim. *Moschetti*, 2022 WL 3329926, at *9 (citations omitted); *see also Tattrie v. CEI-Roanoke, LLC*, No. 7:23cv79, 2023 WL 4186383, at *4–5 (W.D. Va. June 26, 2023) (dismissing *Bowman* claim predicated on VHRA "[b]ecause the VHRA already vindicates the public policy" at issue and stating that plaintiff "cannot work around the structure, limitations, and remedies of the VHRA by bringing a related *Bowman* claim" where "[t]he VHRA prescribes an extensive remedial scheme"); *Hairston v. Nilit Am., Inc.*, No. 4:23cv11, 2023 WL 5447370, at *7 (W.D. Va. Aug. 24, 2023) (same).

Because Dr. Mirshahi fails to state a viable employee public policy *Bowman* claim and because the VWPA preempts her refusal to commit crime, or Type 3, *Bowman* claim, the Court will grant the Motion to Dismiss Count I.

### B. The Court Will Grant the Motion to Dismiss Count II Because Dr. Mirshahi Has Not Stated an Independent Claim Under the Virginia Whistleblower Protection Act

Dr. Mirshahi asserts a claim for retaliatory discharge in violation of the VWPA, relying on three categories of protected activity: (1) that she "report[ed] a violation of . . . law or regulation to a supervisor," Va. Code § 40.1-27.3(A)(1); (2) that she "[r]efuse[d] to engage in a criminal act that would subject [her] to criminal liability," Va. Code § 40.1-27.3(A)(3); and, (3)

---

existence of an extensive statutory scheme disqualifies the underlying policy from also supporting a *Bowman* claim." *See id.*

18

that she "[r]efuse[d] an employer's order to perform an action that violates any federal or state law or regulation and . . . inform[ed] the employer that the order [wa]s being refused for that reason," Va. Code § 40.1-27.3(A)(4). Defendant successfully challenges each of these theories of liability.

### 1. Legal Standard:  Virginia Whistleblower Protection Act (Va. Code § 40.1-27.3)

The Virginia Whistleblower Protection Act (the "VWPA") provides that an employer shall not take retaliatory action against an employee because the employee engaged in an activity that the VWPA protects. Va. Code § 40.1-27.3. For a plaintiff to plead a *prima facie* case of retaliation under the VWPA, the plaintiff must allege that:  (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer took an adverse employment action against the plaintiff; and, (3) a causal link between the two events existed. *See Wood v. Bristol Va. Util. Auth.*, 661 F. Supp. 3d 538, 550 (W.D. Va. 2023). The VWPA further authorizes any employee to sue his or her employer and seek an injunction, reinstatement, and "compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs." Va. Code § 40.1-27.3(C).

A plaintiff employee may establish protected activity in several ways, three of which pertain here. First, the plaintiff may allege that he or she "in good faith report[ed] a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official." Va. Code § 40.1-27.3(A)(1). The Supreme Court of Virginia has noted that the "[g]ood faith . . . test is a subjective one" and that an "act is deemed to be done in good faith" if the act "is done honestly." *Lawton v. Walker*, 343 S.E.2d 335, 337 (Va. 1986). Thus, "good faith is determined by looking to the mind" of the plaintiff. *Id.* at 338. "A plaintiff 'need only . . . prove that [they] opposed an unlawful employment practice which [they] reasonably

19

believed had occurred or was occurring.'" *Wood*, 661 F. Supp. 3d at 550 (quoting *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)). "A plaintiff is not required to show that the underlying report of unlawfulness was in fact meritorious to prevail." *Id.* (citing *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 355 n.1 (4th Cir. 1985), *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). However, the statute does not "[p]ermit an employee to make statements . . . knowing that they are false or that they are in reckless disregard of the truth." Va. Code § 40.1-27.3(B)(2).

Additionally, or in the alternative, the plaintiff may establish protected activity by alleging that he or she either (1) "refuse[d] to engage in a criminal act that would subject the [plaintiff] to criminal liability," or (2) "refuse[d] an employer's order to perform an action that violates any federal or state law or regulation and the employee inform[ed] the employer that the order [was] being refused for that reason." Va. Code § 40.1-27.3(A)(3)–(4).

### 2. Dr. Mirshahi Does Not State a VWPA Retaliation Claim Under Va. Code § 40.1-27.3(A)(1), (A)(3), or (A)(4)

Dr. Mirshahi does not state a VWPA retaliation claim under any of her three pleaded theories. First, because Dr. Mirshahi does not plausibly state that she reported a violation of law or regulation to a supervisor, governing body, or law enforcement official, her claim under subsection (A)(1) fails. Second, because Dr. Mirshahi did not refuse to engage in a criminal act, her claim under subsection (A)(3) also founders. Third, because Dr. Mirshahi does not allege that she informed her employer that she refused to perform an action because it violated a federal or state law or regulation, her claim under subsection (A)(4) fails as well. The Court discusses each in turn.

a. **Dr. Mirshahi Did Not Report a Violation of Law or Regulation to a Supervisor, Governing Body, or Law Enforcement Official**

First, Dr. Mirshahi does not allege that she reported a violation of law or regulation to a supervisor, governing body, or law enforcement official, as required for her conduct to qualify as protected activity under subsection (A)(1). *See* Va. Code § 40.1-27.3(A)(1). Indeed, because Dr. Mirshahi refused to see patients while she was symptomatic, she does not allege that a violation of law or regulation occurred at all, much less that she reported one.

Dr. Mirshahi argues that no "magic words" are required to report a violation and that "when [she] reported to her various supervisors that she had been ordered to treat patients even though she was sick, she reported violations of state law and state regulations." (ECF No. 18, at 18–19.) First, in her First Amended Complaint, Dr. Mirshahi asserts that seeing patients while symptomatic would violate "Patient First's own COVID-19 guidelines," and "the COVID-19 guidelines set forth by the Virginia Department of Health . . . and the CDC." (ECF No. 6 ¶¶ 64–65.) However, guidelines do not carry the force of law and cannot give rise to whistleblower claims. *See HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 97–98 (S.D.N.Y. 2020); *see also Va. Ret. Sys. v. Shelton*, 880 S.E.2d 820, 827–28 (Va. Ct. App. 2022). Second, Dr. Mirshahi alleges that treating patients while symptomatic would violate Va. Code § 54.1-2915 and would constitute criminal assault and terrorism. (ECF No. 6 ¶¶ 67–68.) Even assuming these allegations to be true for the purpose of resolving the motion to dismiss, the *directive* to treat patients while symptomatic does not itself violate the Virginia Code section authorizing the regulation of the medical profession, constitute criminal assault, or qualify as terrorism. Dr. Mirshahi's argument—that by telling her supervisors that Defendants told her to treat patients while ill, she functionally reported a violation of any of the cited laws or regulations—cannot prevail even at the motion to dismiss stage. At most, Dr. Mirshahi told Dr. Schuele that his inquiries regarding

21

when she might return to work and whether she could "switch shifts" in the coming days were "inappropriate." (ECF No. 6 ¶¶ 69–71.) A sizeable gap exists between "inappropriate" conduct and conduct that violates a law or regulation. Dr. Mirshahi's allegations do not plausibly state a claim for VWPA retaliation under Va. Code § 47.1-27.3(A)(1).

### b.   Dr. Mirshahi Did Not Refuse to Engage in a Criminal Act

Second, Dr. Mirshahi does not plausibly claim that she refused to engage in a criminal act, as required to claim the protections of subsection (A)(3). Va. Code § 47.1-27.3(A)(3). Of the authorities Dr. Mirshahi identifies, only two even possibly subject her to criminal prosecution: criminal assault and battery under Virginia state law, (ECF No. 6 ¶ 98 (citing Va. Code § 18.2-57[16])), and terrorism under federal law, (ECF No. 6 ¶ 68 (citing 18 U.S.C. §§ 1038[17] & 2332a[18])). The Court addresses the terrorism argument first.

---

[16] Va. Code § 18.2-57 states, in pertinent part: "Any person who commits a simple assault or assault and battery is guilty of a Class 1 misdemeanor[.]" Va. Code § 18.2-57.

[17] 18 U.S.C. § 1038 states, in pertinent part:

(a) CRIMINAL VIOLATION.—

> (1) IN GENERAL.—Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of [certain federal laws], shall—

>> (A) be fined under this title or imprisoned not more than 5 years, or both[.]

18 U.S.C. § 1038(a)(1)(A). It is unclear why Dr. Mirshahi cited this provision in her First Amended Complaint, as it appears unrelated to the terrorism argument for which she cites the statute. (*See* ECF No. 6 ¶ 68.)

[18] 18 U.S.C. § 2332a states, in pertinent part: "A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction . . . against any person or property within the United States" where the use impacts interstate or foreign

Even drawing all reasonable inferences in the light most favorable to Dr. Mirshahi, the notion that a doctor might subject herself to criminal prosecution for terrorism by treating patients while symptomatic with what she believed might be COVID-19 defies relevant statutory language and all reason. The statutory language requires that a person "use . . . a *weapon* of mass destruction," which is defined to include a "*weapon* involving a biological agent." 18 U.S.C. § 2332a(c)(2)(C) (emphasis added). Dr. Mirshahi does not allege that she was asked to use a weapon. The Court rejects deeming the threat of federal terrorism charges a possible basis for criminal liability sufficient to sustain Dr. Mirshahi's VWPA claim under subsection (A)(3). No reasonable inference exists, even assuming Dr. Mirshahi *had* tested positive for COVID-19 and *had* nonetheless treated patients while ill, that she would have risked criminal terrorism charges as a result.

The assertion that she risked *criminal assault and battery* charges for the same behavior, while not as strained as the specter of possible terrorism charges, also falls well short of stating a plausible claim for relief under subsection (A)(3). Viewing the facts in the light most favorable to Dr. Mirshahi, she refused the Defendants' instructions to "go see patients" while knowingly ill with what she suspected at the time of her refusal might have been COVID-19 or some other communicable disease. These facts do not support a reasonable inference that seeing patients while ill would have subjected Dr. Mirshahi to criminal liability for assault and battery.

Under Virginia common law, "[a] battery is the least *touching* of another, willfully or in anger, including touching done in the spirit of rudeness or insult." *Marshall v. Commonwealth*,

---

commerce "shall be imprisoned for any term of years or for life, and if death results, shall be punished by death or imprisoned for any term of years or for life." 18 U.S.C. § 2332a(a)(2). Section 2332a defines "weapon of mass destruction" to mean "any weapon involving a biological agent, toxin, or vector[.]" 18 U.S.C. § 2332a(c)(2)(C).

822 S.E.2d 389, 393 (Va. Ct. App. 2019) (emphasis added); *see also Adams v. Commonwealth*, 534 S.E.2d 347, 350 (Va. 2000) ("Whether a touching is a battery depends on the intent of the actor, not on the force applied."). "Not every touch is battery, and a touching is not a battery if it is justified or excused." *Parish v. Commonwealth*, 693 S.E.2d 315, 319 (Va. Ct. App. 2010) (cleaned up). Assault entails "an attempt or offer, with force and violence, to do some bodily hurt to another." *Adams*, 534 S.E.2d at 350 (citation and internal quotation marks omitted).[19] "One cannot be convicted of assault and battery without an intention to do bodily harm—either an actual intention or an intention imputed by law." *Id.* (citation and internal quotation marks omitted). Regarding imputation of criminal intent, "the finder of fact may infer that the assailant intends the natural and probable consequences of his [or her] acts." *Parish*, 693 S.E.2d at 319 (cleaned up).

Here, even taking all facts alleged to be true, Dr. Mirshahi has not plausibly pled that seeing patients while symptomatically ill would subject her to liability for assault and battery. First, the command to "go see patients" does not necessitate that Dr. Mirshahi actually *touch* any patients. *See Marshall*, 822 S.E.2d at 393. Dr. Mirshahi cites no case law to support her assertion that "knowing exposure to disease would suffice," (ECF No. 18, at 15), and the Court is

---

[19] Dr. Mirshahi specifically alleges that seeing patients while ill would subject her to potential criminal liability for, *inter alia*, "*assaulting* her patients." (ECF No. 6 ¶ 105 (emphasis added).) However, Dr. Mirshahi's opposition brief identifies the potential criminal charges as "assault and battery." (ECF No. 18, at 14–15.) Thus, the Court construes Dr. Mirshahi's argument to include the risk of criminal liability for battery as well as assault.

"An assault occurs where 'the overt act done puts the party assailed in well founded fear of bodily harm.'" *Adams*, 534 S.E.2d at 352 (Lemons, J., dissenting) (quoting *Burgess v. Commonwealth*, 118 S.E.2d 273, 276 (Va. 1923)). To the extent that Dr. Mirshahi alleges assault rather than battery as the criminal basis for her VWPA claim, she does not allege any facts regarding her would-be victims' "fear of bodily harm." Thus, she has not established that she risked an assault charge.

aware of none.[20]  Second, Dr. Mirshahi lacked any *intent* to harm her would-be patients.

Although intent can be "imputed by law," *Adams*, 534 S.E.2d at 350, and "the finder of fact may

infer that the assailant intends the natural and probable consequences of [her] acts," *Parish*, 693

S.E.2d at 319 (cleaned up), the facts alleged do not allow a reasonable inference that the natural

and probable result of Dr. Mirshahi seeing patients while symptomatically ill would be to injure

her patients.  The fact that Dr. Mirshahi could have worn personal protective equipment, washed

her hands, and engaged in other exposure mitigation measures renders unreasonable any

inference that disease transmission would have been the "natural and probable consequence" of

Dr. Mirshahi seeing patients while she herself was ill but testing negative for COVID-19.

Because Dr. Mirshahi has not plausibly alleged that Defendants asked her to commit

terrorism, assault and battery, or any other crime by seeing patients while symptomatically ill,

the Court will dismiss her claim under Va. Code § 47.1-27.3(A)(3).

---

[20] Dr. Mirshahi cites *Gilbert v. Commonwealth* for the proposition that "[s]pitting . . . suffices to create potential criminal liability." (ECF No. 18, at 15 (citing 608 S.E.2d 509, 511 (Va. Ct. App. 2005)).)  *Gilbert* is inapposite and does not support the inference Dr. Mirshahi asks the Court to draw in this case.

In *Gilbert*, the plaintiff, who appeared intoxicated, "became unruly" while riding in the front passenger seat of a police vehicle and "suddenly turned and spat on [the officer's] head." *Id.*  The court affirmed "the trial court's finding that the act was committed in a rude, insolent, or angry manner," noting that spitting on the officer "involved physical contact and was deeply offensive." *Id.*

Dr. Mirshahi asks the Court to infer that, because spitting on someone's head could constitute battery, so too could knowingly exposing someone to a disease. (ECF No. 18, at 15.) But spitting on someone's head "in a rude, insolent, or angry manner" to show dissatisfaction, as occurred in *Gilbert*, is a far cry from exposing someone to disease despite best efforts to prevent the spread of disease.

     **c.**    **Dr. Mirshahi Does Not Sufficiently Allege That She Informed Her Employer That She Refused to Perform an Action Because It Violated a Federal or State Law or Regulation**

Third, Dr. Mirshahi cannot claim the protection of subsection (A)(4) because she does not allege that she informed her employer that she refused the order for that reason. *See* Va. Code § 47.1-27.3(A)(4). To invoke the protection of subsection (A)(4), Dr. Mirshahi must allege both that she refused to perform an action that violates a federal or state law or regulation *and* that she informed her employer that she refused for that reason. *See id.* Dr. Mirshahi alleges that she did not see patients and went home. (ECF No. 6 ¶¶ 60, 63.) Viewing the facts in the light most favorable to Dr. Mirshahi and drawing all reasonable inferences in her favor, Dr. Mirshahi adequately alleges that seeing patients while symptomatically ill with what she suspected might have been COVID-19 would have violated federal and state regulations. (ECF No. 6 ¶ 65 ("Treating patients while symptomatic for COVID-19 also would violate the COVID-19 guidelines set forth by the Virginia Department of Health . . . and the CDC.").)

However, Dr. Mirshahi does not adequately allege that she informed her employer that the reason for her refusal was to avoid violating these regulations. Dr. Mirshahi alleges that she told her supervisor, Dr. Schuele, that his words were "inappropriate given her sick condition," and that she e-mailed Patient First's corporate headquarters and a physician manager to inform them that Defendants "had told her to see patients even after she had been tested for COVID-19." (ECF No. 6 ¶ 71.) She also asserts that she texted the regional physician manager "Today I was a patient. I WAS NOT PUT FIRST . . . There is something fundamentally wrong with you all." (ECF No. 6 ¶ 71.) Across all of these interactions, Dr. Mirshahi does not allege that she ever explained the reason for her refusal to see patients, let alone that the reason was because to do otherwise would violate a law or regulation. Because Dr. Mirshahi does not allege that she

informed a supervisor that the reason she refused to work while symptomatic was because to do otherwise would violate a law or regulation, Dr. Mirshahi cannot claim the protection of Va. Code § 47.1-27.3(A)(4).

The Court will grant the Motion to Dismiss Count II (VWPA) because Dr. Mirshahi has not plausibly alleged that she reported a violation of law or regulation, refused to engage in a criminal act, or informed her employer that she refused to perform the requested action because it violated a law or regulation. Because the Court will grant the Motion to Dismiss the VWPA claims, the Court does not address Defendants' alternative argument to strike certain damages as exceeding the remedies set forth in the VWPA at Va. Code § 40.1-27.3(C). (*See* ECF No. 12, at 27–28.)

### C.   The Court Will Grant the Motion to Dismiss Count V (Defamation)

Dr. Mirshahi asserts two bases for defamation:  (1) Nurse Cericola's oral statement to co-workers at Patient First that Dr. Mirshahi was faking her illness; and, (2) Nurse Cericola's inaccurate transcription of a patient complaint to implicate only Dr. Mirshahi when in fact the patient's complaint was also directed at a physician's assistant. (ECF No. 6 ¶ 121.)

Defendants argue that Dr. Mirshahi's defamation claims fail as a matter of law. (ECF No. 12, at 20.)  First, Defendants contend that Nurse Cericola's telling co-workers that Dr. Mirshahi was pretending to be sick is not actionable because the statement is not defamatory *per se* and because it reflects Nurse Cericola's opinion rather than a fact. (ECF No. 12, at 20.) Second, Defendants claim that Nurse Cericola's alleged false transcription of a patient report is not actionable because the report's "alleged 'false implication' . . . has no sting," "does not imply that Plaintiff lacked the skills or character required to perform the occupation of a physician," and is not "'necessarily hurtful' in its effect on [Plaintiff's] business" or in her occupation as a

physician. (ECF No. 12, at 24–25 (quoting *Fleming v. Moore*, 275 S.E.2d 632, 636 (Va. 1981) (alteration in original).)

The Court will grant the Motion to Dismiss Count V (defamation) as to both alleged instances of defamation. First, Nurse Cericola's statement that Dr. Mirshahi was "not sick" and was "pretending" is not actionable as defamation because, although it can be proven false, it cannot be read to contain the requisite defamatory "sting." Second, the incorrect patient complaint transcription does not present an actionable statement for defamation because it is not defamatory *per se* and because it lacks the requisite defamatory "sting." Because neither allegedly defamatory statement is actionable, the Court will dismiss Count V.

### 1.    Legal Standard:  Defamation Under Virginia Common Law

In Virginia, a plaintiff alleging defamation must plead "(1) publication of (2) an actionable statement with (3) the requisite intent." *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013) (quoting *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005)). Here, Defendants do not contest publication or intent and, instead, argue only that the allegedly defamatory statements are not actionable. (ECF No. 12, at 20–25.) Defendants also raise a defense of privilege. (ECF No. 12, at 25–27.) Accordingly, the Court focuses its analysis on element two, whether the statements are actionable, and briefly addresses the privilege defense.

"To be actionable, [a] statement must be both false and defamatory." *Kollman*, 612 S.E.2d at 206 (citing *M. Rosenberg & Sons v. Craft*, 29 S.E.2d 375, 378 (Va. 1944); *Ewell v. Boutwell*, 121 S.E. 912, 916 (Va. 1924); *Chapin v. Knight-Ridder*, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993)).

At the motion to dismiss stage, "the court must of course credit the plaintiff's allegation of the factual falsity of a statement." *Chapin*, 993 F.2d at 1092 (citing *Conley v. Gibson*, 335

28

U.S. 41 (1957), *overruled on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

However, a statement *cannot* be false unless it "contain[s] a provably false factual connotation."

*Tharpe*, 737 S.E.2d at 893. Thus, "[s]tatements that express only the speaker's opinion and not

matters of fact are not actionable as defamation because such statements cannot be shown to be

false." *Gov't Micro Res., Inc. v. Jackson*, 624 S.E.2d 63, 69 (Va. 2006) (citing *Fuste v. Riverside

Healthcare Ass'n, Inc.*, 575 S.E.2d 858, 861 (Va. 2003)). Generally, "[s]tatements that are

relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion."

*Id.* (internal quotation marks omitted) (quoting *Fuste*, 575 S.E.2d at 861). In every case,

however, "[w]hether an alleged defamatory statement is one of fact or opinion is a question of

law and is, therefore, properly decided by a court instead of a jury." *Fuste*, 575 S.E.2d at 861

(citation omitted). Courts must consider each "alleged defamatory statement . . . as a whole to

determine whether it states a fact or non-actionable opinion." *Jackson*, 624 S.E.2d at 69.

In addition to the falsity requirement, a statement is not actionable unless it is

defamatory. "Virginia law requires the statements at issue to either fit within a specific category

of defamation *per se* or be sufficiently severe to meet the general defamation standard."

*Meredith v. Nestle Purina Petcare Co.*, 516 F. Supp. 3d 542, 554 (E.D. Va. 2021) (quoting

*Echtenkamp v. Loudon Cnty. Pub. Schs.*, 263 F. Supp. 2d 1043, 1061 (E.D. Va. 2003))

(cleaned up).

Virginia law recognizes certain statements as defamatory *per se*, including statements

which impugn the plaintiff's fitness for his or her trade, or prejudice the plaintiff in pursuit of his

or her trade. *Hatfill v. New York Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005). A statement that

is defamatory *per se* "must contain an imputation that is 'necessarily hurtful' in its effect upon

plaintiff's business and must affect him [or her] in his [or her] particular trade or occupation."

*Fleming*, 275 S.E.2d at 632. Further, a nexus must exist between the allegedly defamatory statement and the "skills or character required to carry out the particular occupation of the plaintiff." *Id.* at 636; *Marroquin v. Exxon Mobil Corp.*, No. 08–391 (CMH), 2009 WL 1529455, at *8 (E.D. Va. May 27, 2009) (statement that plaintiff was fired for doing "something very bad" lacked sufficient nexus to plaintiff's job duties to constitute defamation *per se*).

To meet the general defamation standard, words must carry "the requisite defamatory 'sting' to one's reputation." *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015) (citing *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 255 (2014); *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 138 (1967)). Such language is of the kind that "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him [or her], or which tends to hold him [or her] up to scorn, ridicule, or contempt, or which is calculated to render him [or her] infamous, odious, or ridiculous." *Id.* (quoting *Moss v. Harwood*, 46 S.E. 385, 387 (Va. 1904)) (citing *Adams v. Lawson*, 58 Va. (17 Gratt.) 250, 255–56 (1867); *Moseley v. Moss*, 47 Va. (6 Gratt.) 534, 538 (1850)).

In determining whether words are defamatory under these standards, "it is a general rule that [the] allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used." *Schaecher*, 772 S.E.2d at 595 (quoting *Carwile v. Richmond Newspapers, Inc.*, 82 S.E.2d 588, 591–92 (Va. 1954)). "[W]hether a statement is capable of having defamatory meaning is a question of law." *Hatfill*, 416 F.3d at 330.

### 2. Dr. Mirshahi Does Not State a Claim for Defamation as to Nurse Cericola's Statement That Dr. Mirshahi Was "Not Sick" and Was "Pretending"

Dr. Mirshahi fails to state a claim for defamation as to Nurse Cericola's statement that Dr. Mirshahi was "not sick" and was "pretending" because, although the statement contains a provably false factual connotation, *see Tharpe*, 737 S.E.2d at 893, it nevertheless cannot be read to contain the requisite defamatory "sting."

First, drawing all reasonable inferences in favor of Dr. Mirshahi, Nurse Cericola's assertion that Dr. Mirshahi was "not sick" and was "pretending" to be sick could "contain a provably false factual connotation," *see Tharpe*, 737 S.E.2d at 893, because it is possible to prove whether an individual is sick—for instance by administering a COVID-19 test, as occurred here. Nurse Cericola's statement that Dr. Mirshahi was "not sick" could contain a provably false factual connotation and thus could constitute a statement of fact rather than opinion. *See id.* Further, Dr. Mirshahi alleges that she *was* sick and was *not* pretending. (ECF No. 6 ¶¶ 62 ("[Dr. Mirshahi] was . . . seriously ill at the time and was unable to work due to her sickness.").) At the motion to dismiss stage, the Court must credit Dr. Mirshahi's allegations that Nurse Cericola's statement was factually false. *See Chapin*, 993 F.2d at 1092 (citations omitted). Thus, Nurse Cericola's statement to her colleagues that Dr. Mirshahi "was not sick" and was "pretending" to be sick could be false and so satisfies the falsity requirement at the motion to dismiss stage.

However, even drawing all reasonable inferences in Dr. Mirshahi's favor, Nurse Cericola's statement could not be considered defamatory. Nurse Cericola's statement does not constitute defamation *per se*. The statement that Dr. Mirshahi was "not sick" and was "pretending" does not relate to "the skills or character required to carry out the particular occupation" of physician. *See Fleming*, 275 S.E.2d at 636. Such a statement does not "affect

31

[Dr. Mirshahi] in [her] particular trade or occupation." *See id.* at 632. Nor has Dr. Mirshahi adequately alleged that the statement was *generally* defamatory. The notion that Dr. Mirshahi was faking an illness, while perhaps embarrassing, does not tend to "injure [her] reputation in the common estimation of mankind, . . . hold [her] up to scorn, ridicule, or contempt, or . . . render [her] infamous, odious, or ridiculous." *See Schaecher*, 772 S.E.2d at 594 (citations omitted). That the Amended Complaint describes the comments as "bad-mouth[ing]", (ECF No. 6 ¶ 61), further cements that the statements more closely resemble office gossip rather than stinging defamation. That Nurse Cericola is a medical professional does not change the outcome, particularly where she was speaking to other co-workers at the Clinic who were capable of making their own judgment as to the credibility of Nurse Cericola's assertion. Thus, even taking all alleged facts as true and drawing all reasonable inferences in the light most favorable to Dr. Mirshahi, Nurse Cericola's statement that Dr. Mirshahi was "not sick" and was "pretending" is not actionable as defamation because it is not capable of having defamatory meaning.

3. **Dr. Mirshahi Does Not State a Claim for Defamation as to the Inaccurate Transcription of the Patient Complaint Because It Is Not Defamation *Per Se* and It Lacks Defamatory "Sting"**

Nurse Cericola's transcribed patient complaint allegedly created a "false implication" that the patient had only complained about Dr. Mirshahi when in fact the patient had also complained about a physician's assistant who, like Dr. Mirshahi, refused to prescribe the patient antibiotics. (ECF No. 6 ¶¶ 85–89, 121.) The transcription does not constitute defamation *per se* because the complaint states that Dr. Mirshahi refused to prescribe antibiotics, which Dr. Mirshahi herself characterizes as good medical practice that is consistent with guidance from the Centers for Disease Control and Prevention and the American Medical Association. (ECF No. 6 ¶¶ 41, 44.) A statement that Dr. Mirshahi practiced medicine in conformity with guidance from leading

professional bodies does not impugn her fitness for her trade or prejudice her in pursuit of her trade. *See Hatfill*, 416 F.3d at 330. Even considering the context of Nurse Cericola's belief that "a few more" complaints for Dr. Mirshahi "and she's outta here!", (ECF No. 6 ¶¶ 89–90), the statements in the patient complaint transcription were all accurate as to Dr. Mirshahi so do not satisfy the falsity requirement of a defamation claim.

Further, the transcription is not actionable because it lacks the requisite defamatory "sting." *See Schaecher*, 772 S.E.2d at 594. The allegations in the complaint lack the sort of language that would "tend[] to injure [Dr. Mirshahi's] reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon [her], or . . . hold [her] up to scorn, ridicule, or contempt, or . . . render [her] infamous, odious, or ridiculous." *See id.* Indeed, as discussed above, Dr. Mirshahi herself states that the course of action described in the patient complaint is both factually accurate and medically indicated. Thus, it is neither false nor defamatory to suggest that Dr. Mirshahi declined to prescribe antibiotics in conformance with the guidance of established medical authorities. The allegation that Nurse Cericola insinuated that the complaint ran *only* against Dr. Mirshahi does not change the fundamental facts that the complaint is both factually accurate and lacks defamatory "sting." Because the transcription of the patient complaint is incapable of having defamatory meaning, *see Hatfill*, 416 F.3d at 330, it fails to state a plausible claim for defamation.

Because both the oral statement to co-workers and the inaccurate transcription of the patient complaint fail to state a claim for defamation, the Court will grant the Motion to Dismiss Count V. Because the Court dismisses the defamation claim, it does not evaluate Defendant's assertion of the privileged communication defense. (ECF No. 12, at 25–27.)

## **IV.  Conclusion**

For the foregoing reasons, the Court will grant the Motion to Dismiss.  (ECF No. 11.)

The Court will deny the Motion for Hearing.  (ECF No. 17.)

An appropriate Order shall issue.

Date:  8/13/2024
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

34