IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**SHAGHAYEGH MIRSHAHI, M.D.**
**Plaintiff,**

**v.**

Civil Action No. 3:23cv00495

**PATIENT FIRST RICHMOND MEDICAL**
**GROUP, LLC,**

**Defendant.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendant Patient First Richmond Medical Group PLLC's[1] ("Patient First") Motion for Summary Judgment (the "Motion").[2] (ECF No. 48.) Plaintiff Shaghayegh Mirshahi responded in opposition, (ECF No. 55), and Patient First replied, (ECF No. 59).

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

For the reasons articulated below, the Court will grant the Motion for Summary Judgment and will dismiss this action. (ECF No. 48.)

---

[1] Although Defendant is referred to as Patient First Richmond Medical Group, LLC, in the Amended Complaint, Defendant refers to itself as Patient First Richmond Medical Group, PLLC. (ECF No. 48, at 1.)

[2] The Court employs the pagination assigned by the CM/ECF docketing system.

## I.  Factual and Procedural Background

### A.    Undisputed Factual Background[3]

#### 1.    Patient First Hires Dr. Mirshahi as a Physician in December 2018

In 2018, Dr. Mirshahi applied to be a physician at Patient First.  (ECF No. 49-1 ("Sowers Decl.") ¶ 11; *see* ECF No. 55-2 ("Mirshahi Decl.") ¶ 4.)  Dr. Mirshahi is Iranian.  (Mirshahi Decl. ¶ 3; ECF No. 54-1, at 1.)  Dr. Kent Schuele, the Medical Director at Patient First's Newtown Road Medical Center, interviewed Dr. Mirshahi and recommended her for hire at Patient First's Newtown location.  (Sowers Decl. ¶ 12; ECF No. 49-4 ("Schuele Decl.") ¶ 4.)  Mr. Sowers, the then-Vice President of the Physician Relations Department[4] at Patient First, approved Dr. Mirshahi's hire. (Sowers Decl. ¶¶ 2, 12.)

#### 2.    Patient First's Physician Employment Agreement and Handout Policy

On December 13, 2018, shortly before she began her employment, Dr. Mirshahi entered into a Physician Employment Agreement (the "Agreement") with Patient First.  (ECF No. 49-5, at 1–16; Sowers Decl. ¶ 13.)  The Agreement stated, in part:

> Patient First shall have the sole authority to establish policies, procedures and operational guidelines regarding the provision of medical services by Patient First and operation of Patient First medical centers.  Physician shall perform professional medical services in accordance with, and otherwise comply fully with, policies established by Patient First. . . .  Physician agrees to comply with the

---

[3] When considering a motion for summary judgment, a court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary.  *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995).

[4] "The Physicians Relations Department of Patient First is responsible for . . . the recruitment, hiring, discipline, and termination of physicians[.]"  (Sowers Decl. ¶ 5.)  In his role as Vice President of Physician Relations, Mr. Sowers "had the power and authority . . . to approve or disapprove the hiring of physicians and to terminate physicians."  (Sowers Decl. ¶ 5.)

recommendations and requirements of the Quality Improvement Committee and any other quality assurance program established by Patient First.

(ECF No. 49-5, at 2.)

Patient First's Quality Improvement Committee ("QIC") "prepare[s], compile[s], and approve[s]" "written instructions . . . [for distribution to patients at the end of their visits] that address the patients' specific diagnosis or condition and describe the care and treatment regimen that the patients should follow." [5] (ECF No. 49-2 ("Zieve Decl.") ¶ 3; Sowers Decl. ¶ 8.) At the time that she began her employment, Dr. Mirshahi was aware that Patient First had pre-approved handouts that were provided to patients at the end of their visit about their treatment. (ECF No. 49-3 ("Mirshahi Depo."), at 283:4–15; *see also* Mirshahi Decl. ¶ 5.)

In February 2019, Dr. Mirshahi began working as a full-time physician at Patient First's Newtown Road Medical Center. (Sowers Decl. ¶ 13.) At the time, "she was one of four physicians working full-time at that Center." [6] (Sowers Decl. ¶ 14.) Newtown Medical Director Schuele was Dr. Mirshahi's "direct supervisor throughout the entire period of her employment at Patient First." (Schuele Decl. ¶ 3; Mirshahi Decl. ¶ 14.) Dr. Mirshahi's employment at Patient First proceeded without issue from the time she began working in February 2019 until the onset of the COVID-19 pandemic in 2020. (Schuele Decl. ¶ 5; *see also* Sowers Decl. ¶ 16.)

---

[5] Dr. Sandra Zieve, a Patient First physician since 1985 and a member of the QIC since 1988, averred that the pre-approved patient handouts are important for two reasons: "(1) the Instructions have been fully vetted by the QIC and conform to the standard of care required for the patient's condition; and (2) Patient First maintains an electronic record showing that the Instructions were provided to the patients, which allows Patient First to know precisely what written guidance has been given to its patients." (Zieve Decl. ¶ 3; *see also* Sowers Decl. ¶ 8.)

[6] The other physicians were Drs. Kent Schuele, Ivia Somerville, and Olga Elliot. "Dr. Somerville retired in January 2021, and Dr. Elliot went out on medical leave in late January 2021." (Sowers Decl. ¶ 14.)

### 3. In 2020, Dr. Mirshahi Vacates Her Physician Office to Work Behind the X-Ray Room and Files an Internal Hotline Submission Regarding a Dispute with Nurse Manager Liverman

At "the onset of the pandemic in 2020", Dr. Mirshahi "vacated her physician's office at Newtown and began sitting in a back room behind the x-ray suite where she was away from the other staff." (Schuele Decl. ¶ 6.) "Staff complained to [Newtown Medical Director Schuele] that this impeded access to [Dr. Mirshahi] when she was needed for patient care." (Schuele Decl. ¶ 6.) Dr. Schuele "tried not to upset [Dr. Mirshahi] further by asking her to vacate the x-ray room." (Schuele Decl. ¶ 6.)

On April 3, 2020, Dr. Mirshahi filed a hotline submission through Patient First's Compliance Weblink system regarding a dispute with Director of Medical Support ("DMS")[7] Nurse Isabelle Liverman. (Sowers Decl. ¶ 15; ECF No. 49-1, at 13–14.) In her submission, Dr. Mirshahi explained that on March 14, 2020, she saw a patient who tested positive for the flu. (ECF No. 49-1, at 14.) Dr. Mirshahi recommended that the patient, who was also a Patient First employee, "not com[e] into work for the duration of her treatment, 5 days" and instructed her "to contact the nurse manager, Isabelle Liverman, per procedure so that a replacement could be found" for any days the patient was scheduled to work. (ECF No. 49-1, at 14.) Dr. Mirshahi complained that DMS Nurse Liverman told the patient "'Dr. Mirshahi is overly cautious' and that it is 'fine' to return to work after 2 days of treatment but it would be up to her, the patient." (ECF No. 49-1, at 14.) Dr. Mirshahi wrote that DMS Nurse Liverman's "words and actions were not only short sighted but also dangerous" and that "[DMS Nurse] Liverman has proven herself to be an irresponsible manager time and again." (ECF No. 49-1, at 14.)

---

[7] A Director of Medical Support ("DMS") "is responsible for the supervision of the non-physician staff at a [Patient First] Center." (Sowers Decl. ¶ 15.)

Approximately one month later, on May 1, 2020, DMS Nurse Liverman sent an email regarding the same occurrence to Tracy Chandler, the Vice President of Human Resources. (ECF No. 49-1, at 15–16.)  DMS Nurse Liverman informed H.R. Vice President Chandler that Dr. Mirshahi "had recently started sitting in the file room behind the x-ray department" and that she had asked Dr. Mirshahi "if she would be able to work in the Doctor's office or the PSC's office" because her relocation to the file room was causing delays and "if there was another emergency [they] would have to wait for the x-ray door to open for her help." (ECF No. 49-1, at 16.)  DMS Nurse Liverman wrote that Dr. Mirshahi responded that she would not move from the area and "would stay where she was." (ECF No. 49-1, at 16.)

On May 5, 2020, H.R. Vice President Chandler forwarded DMS Nurse Liverman's email regarding the dispute with Dr. Mirshahi to Mr. Sowers, the Vice President of Physician Relations. (ECF No. 49-1, at 15.)  Vice President Sowers forwarded the email to Dr. Ramin Mazhari–the Regional Medical Director of the Northern Virginia region, where Dr. Mirshahi was considering moving.  In the email, Vice President Sowers wrote, "I think this [is] completely related to her anxiety about COVID.  She was not problematic at all prior to the pandemic." (ECF No. 49-1, at 15; Sowers Decl. ¶ 16.)

> **4.    On April 1, 2021, Dr. Mirshahi is First Told to Stop Distributing Her Self-Made Handouts to Patients That Had Not Been Approved by Patient First's Quality Improvement Committee**

Approximately one year later, on April 1, 2021, Indian River DMS Nurse Heather Swanner[8] informed Regional Medical Director of the Richmond and Tidewater region, Dr. Maulin Desai, via email that Dr. Mirshahi, who was covering a shift at Patient First's Indian

---

[8] Nurse Swanner is "the Director of Medical Support . . . at the Indian River Medical Center in Virginia Beach, Virginia." (ECF No. 49-7 ("Desai Decl.") ¶ 5.)

River location in Virginia Beach that day, "was distributing her own self-made handouts to patients concerning their Covid treatment."[9]  (Desai Decl. ¶ 5; ECF No. 49-7, at 8; *see also* Mirshahi Decl. ¶ 16.)  As the Regional Medical Director of the Richmond and Tidewater region of Patient First, Dr. Desai serves as the supervisor of Dr. Mirshahi's direct supervisor, Newtown Medical Director Dr. Schuele.  (Desai Decl. ¶ 2; Schuele Decl. ¶ 3.)  Regional Medical Director Desai responded to Indian River DMS Nurse Swanner, "[T]his is not OK.  She should be handing out the patient education handouts that get printed from each protocol ran, and any additional recommendations given should be dictated in the chart."  (ECF No. 49-7, at 8; Desai Decl. ¶ 6.)  Dr. Desai added in his response to Nurse Swanner that Dr. Mirshahi could "submit the forms to QIC for approval."  (ECF No. 49-7, at 8; Desai Decl. ¶ 6.)  Indian River DMS Nurse Swanner asked Dr. Desai, "Should I tell her this and ask her not to distribute?" and Dr. Desai responded, "Yes please."  (ECF No. 49-7, at 7.)

That day, Indian River DMS Nurse Swanner communicated Regional Medical Director Desai's instruction to Dr. Mirshahi that she stop distributing her self-made handouts, explaining,

---

[9] Dr. Mirshahi asserts that she began "giving out [her] own written medical handouts to [her] patients" "beginning in mid-2020[.]"  (Mirshahi Decl. ¶ 6; *see also* Mirshahi Depo., at 298:6–22.)  She adds that "at no time prior to April 1, 2021 did anyone at Patient First's Newto[w]n Road Location – including my direct supervisor (Dr. Kent Schuele) and the on-site nurse supervisor (Nurse Jennifer Cericola), both of whom were aware that I was distributing [these] handouts to patients – say anything to me about *not* using or distributing [these] handouts."  (Mirshahi Decl. ¶ 14 (emphasis in original).)  Dr. Mirshahi states that "Dr. Sch[ue]le had specifically looked at my handouts and told me he thought they were good."  (Mirshahi Decl. ¶ 14.)

To the extent there is a dispute of fact regarding whether Dr. Mirshahi was instructed not to distribute her handouts prior to April 1, 2021, any such dispute would be immaterial because the undisputed facts discussed *supra* evince that on April 1, 2021, Dr. Mirshahi was instructed to stop distributing her own handouts.  (Mirshahi Depo., at 302:1–10; 319:12–320:2; Mirshahi Decl. ¶ 16.)  Whether she was also so instructed prior to April 1, 2021 is of no moment for purposes of this Court's analysis.

"[I]t's against policy . . . to have these types of handouts and give them out to patients."[10]
(Mirshahi Depo., at 302:1–10; 319:12–320:2; Mirshahi Decl. ¶ 16.)  Dr. Mirshahi "immediately
complied" and "after April 1, 2021 (up through the end of [her] employment with Patient First),
[] never distributed to anyone, or used, any of [her self-made] handouts at Patient First."
(Mirshahi Decl. ¶ 22; Mirshahi Depo., at 316:20–317:2.)

Also on April 1, 2021, Jane Green, then the Director of Physician Relations, sent an
email to Vice President Sowers attaching Dr. Mirshahi's handout.  (ECF No. 49-1, at 19–21; *see
also* Sowers Decl. ¶ 5.)  Vice President Sowers forwarded the email to Regional Medical
Director Desai, writing, "We should discuss this one.  Apparently [Dr. Mirshahi] has done her
own write-up and is handing it out to patients . . . Never a dull moment!" (ECF No. 49-1, at 19;
Sowers Decl. ¶ 18.)

### 5.     Dr. Mirshahi Learns of the QIC Process for Seeking Approval of Her Self-Made Handouts

Still on April 1, 2021, Dr. Mirshahi sent a text message to Albert Stevens, a physician
relations specialist at Patient First, explaining that she had been informed that, per Regional
Medical Director Desai's instruction, she was not permitted to "hand out any advice to patients
beyond what is printed out."  (ECF No. 49-8, at 3; *see also* Mirshahi Decl. ¶ 23.)  Dr. Mirshahi
and Physician Relations Specialist Stevens spoke on the phone "soon thereafter."  (Mirshahi
Decl. ¶ 23.)  In her call with Specialist Stevens, Dr. Mirshahi "learned that Patient First had a
process in place – called a 'QIC process' – where [she] could present [her] handouts to the

---

[10] The record is unclear regarding whether Nurse Swanner communicated Dr. Desai's
instruction that Dr. Mirshahi could "submit the forms to QIC for approval, if she feels strongly
about the forms" to Dr. Mirshahi.  (ECF No. 49-7, at 8.)  Viewing the record in the light most
favorable to Dr. Mirshahi, as the Court must, the Court reasonably infers that Nurse Swanner did
not communicate Dr. Desai's instruction that Dr. Mirshahi submit her forms to QIC for approval.

administration for review and potential approval." (Mirshahi Decl. ¶ 24.) Dr. Mirshahi asserts that "[p]rior to speaking with Mr. Stevens, [she] knew nothing about the 'QIC' process" and that "neither Dr. Desai nor Nurse Swanner" had mentioned the QIC process when they "told [Dr. Mirshahi] to cease using [her] handouts." (Mirshahi Decl. ¶ 24.)

After her call with Physician Relations Specialist Stevens, Dr. Mirshahi emailed him "samples of [her] handouts." (Mirshahi Decl. ¶ 25.) Specialist Stevens confirmed receipt and wrote that he would send the handouts to Patient First administration for review, stating, "I asked about [the handouts] and showed them what your recommendations were they are going to read it and then they will let you know because I am not sure. . . . Just letting you know that they will talk to you. It looks good to me I think." (Mirshahi Decl. ¶ 25 (emphasis omitted).) Dr. Mirshahi "did not receive an immediate response . . . to [this] request for the administration to review [her] handouts." (Mirshahi Decl. ¶ 26.)

### 6.    On April 5, 2021, Dr. Mirshahi is Instructed to Stop Distributing Her Self-Made Handouts at Patient First's Newtown Location

Four days later, upon her return to Patient First's Newtown location on April 5, 2021, Dr. Mirshahi was "also instructed not to use handouts at Newtown [Patient First facility] as well." (Mirshahi Depo., 322:19–22; *see also* Mirshahi Decl. ¶ 27 (stating that "when I returned to work at the Newtown Road Location . . . on April 5, 2021 [] my handouts were completely gone and I understood at that point that I could no longer use my handouts at *that location* as well" (emphasis in original).) The same day, Dr. Mirshahi reached out to Specialist Stevens via text message, stating, "I cannot give out my handouts anymore, apparently . . . . It seems word has gotten around and now I cannot give out my advice[.]" (ECF No. 49-8, at 4.) Dr. Mirshahi also told Physician Relations Specialist Stevens, "no one got back to me as yet" and Mr. Stevens responded, "Sorry to hear that I thought it was useful information[.]" (ECF No. 49-8, at 5.)

Dr. Mirshahi wrote, "If you could get the parties involved to get back to me . . . [r]egarding those handouts . . . If they say no they can say no to me instead of ignoring and hoping it'll go away." (ECF No. 49-8, at 6.) Physician Relations Specialist Stevens replied, "Yeah I will see what I can do [because] I thought it was great information[.]" (ECF No. 49-8, at 7.) Dr. Mirshahi asserts that "despite going through the proper channels and [] even following up with Physician Relations Specialist Stevens, Patient First never responded to [her] requests for QIC approval for [her] handouts." (Mirshahi Decl. ¶ 31 (emphasis omitted).)

### 7.   Dr. Mirshahi's Patient Complaints

During Dr. Mirshahi's employment at the Newtown Patient First facility, she was the subject of multiple patient complaints to which she was required to respond, which she described as a source of frustration. (Mirshahi Depo., at 326:21–327:20; 329:1–3; *see also* Schuele Decl. ¶ 8.) In turn, Dr. Mirshahi also submitted complaints about patients. (Mirshahi Depo., at 330:5–7.)

"[W]ithout [her self-made] handouts, in the midst of the COVID-19 pandemic, and with an already-existing staffing shortage at the Newtown Road location," Dr. Mirshahi "began to increasingly encounter patients who refused or challenged her medical advice and treatment" and "many of these patients responded to [her] with condescension, racism, bigotry, or a combination of all three." (Mirshahi Decl. ¶¶ 33–34.) "[A]mong the many derogatory remarks made to [Dr. Mirshahi], [her] patients said things such as:" "Where are you from?", "What country are you from?", "You aren't American," and "Can I see the older white male doctor?" (Mirshahi Decl. ¶ 35 (emphasis omitted).) Dr. Mirshahi also experienced incidents of patients "demanding to see 'an American doctor'" or "a 'real doctor'", asking her if she was a nurse, and stating that women who are from Iran are "all 'homemakers' who had to 'cover up' and 'pour men their tea.'"

(Mirshahi Decl. ¶ 35 (emphasis omitted).)  While she does not allege specific dates on which patients made these comments, Dr. Mirshahi asserts that "[a]ll of these comments occurred between April 1, 2021 and July 1, 2021."  (Mirshahi Decl. ¶ 35.)

Dr. Mirshahi asserts that she "repeatedly reported these comments – by texts, e-mails, and even verbal conversations – to Patient First's Corporate office and to [Newtown Medical Director] Schuele" and that "between April and June of 2021," she and Newtown Medical Director Schuele "had at least three talks about subjective patient complaints."  (Mirshahi Decl. ¶¶ 36–37.)  Dr. Mirshahi asserts that she "expressly informed Dr. Schuele that [she] was suffering discrimination because of the sexist/racist/bigoted insults and remarks begin made to [her] by [her] patients."[11]  (Mirshahi Decl. ¶ 38.)  Dr. Mirshahi asserts that "in at least one of those talks, Dr. Schuele . . . said 'These are complaints I do not get because of who I am and what I look like.'"  (Mirshahi Decl. ¶ 39.)

On May 23, 2021, Dr. Mirshahi sent an email to Carrie Bass, a Physician Relations Administrative Assistant, regarding an encounter she had with a patient that day.  (ECF No. 49-1, at 23–25, 27.)  Dr. Mirshahi complained that the patient was "aggressive" and "made everyone, including myself, feel very uncomfortable and uneasy."[12]  (ECF No. 49-1, at 24.)  On May 25, 2021, Administrative Assistant Bass forwarded Dr. Mirshahi's email to Vice President Sowers.  (ECF No. 49-1, at 22.)  Vice President Sowers replied to Administrative Assistant Bass the next day, asking her to respond to Dr. Mirshahi by thanking her for sharing her concerns and letting her know that she passed her email along "so everyone will be aware in the event that the

---

[11] In a July 6, 2021 email to Administrative Coordinator Moore, copying Administrative Assistant Bass, in reference to "dealing with ageism, sexism and racism", Dr. Mirshahi wrote, "These patients are few and far between, thank goodness."  (ECF No. 49-1, at 31.)

[12] Dr. Mirshahi did not complain of any remarks made by this patient related to her color, sex, or national origin.

patient lodges a complaint, and so they are aware of your concerns regarding patient behavior in general." (ECF No. 49-1, at 22.)

Administrative Assistant Bass also forwarded Dr. Mirshahi's email regarding the aggressive patient to Danielle Moore, a Patient First Administrative Services Coordinator, who sent an email to Dr. Mirshahi advising her that if she felt the patient's behavior "warrants a dismissal review," to "discuss with [Newtown Medical Director] Dr. Schuele and have him submit the Patient Dismissal Request Form to be reviewed." (ECF No. 49-1, at 26.) On June 2, 2021, Dr. Mirshahi responded to Administrative Coordinator Moore, stating that she did "not wish to dismiss" the patient from Patient First. (ECF No. 49-1, at 26.) Dr. Mirshahi clarified that she did "not expect anything from administration except the opportunity to tell the truth about how [the patient] made [her and others] feel . . . in the hope that, when the complaint comes in, you will have the appropriate background." (ECF No. 49-1, at 26.)

Just one month later, on July 1, 2021, at 2:35 a.m., Dr. Mirshahi sent an email to Newtown Medical Director Schuele with the subject line "work/patient load." (ECF No. 49-4, at 17.) She wrote that "[t]onight PA Matthews and I were put in what I would consider an unjust and, quite frankly, borderline abusive situation whilst working." (ECF No. 49-4, at 18.) Dr. Mirshahi described that "many of our patients do not regularly see medical providers and have poor medical literacy . . . making this work environment unsafe not only for them, because we are spread too thin, but also for us and our mental and physical well beings." (ECF No. 49-4, at 18.) She wrote that, "I am constantly afraid of patient complaints [] because I am afraid of having to answer email after email of patient complaints from patients who, honestly, unrealistically tried to solve every issue in one visit that I feel I cannot exit the room . . . [and] other patients become angry because of wait times." (ECF No. 49-4, at 18.) She concluded, "I

11

just feel as though I have to say something at this point because I feel as though[] the situation is

becoming truly untenable." (ECF No. 49-4, at 18.)[13]

 Newtown Medical Director Schuele responded to Dr. Mirshahi via email the same day, at

8:17 a.m., stating, in part:

> I appreciate how hard everyone works, but to be honest, despite high acuity, the center only saw 133 patients yesterday. Your average visit times were 140 minutes (you did a good job on small visits at 33 minutes). Your overall patient volume was 2.8 patients per hour. When I checked the center at around 6pm there were several patients waiting 4 hours or more. I'm not trying to blame the messenger but as we've discussed efficiency also matters. . . . Let me know if you need help with improving your times, I'm happy to come in and work beside you to give some pointers.

(ECF No. 49-4, at 17.)

  **8. On July 1, 2021, Dr. Mirshahi Sends a Text Message to Newtown Medical Director Schuele Stating That She Will Resume Giving Out Her Self-Made Handouts to Patients Despite Having Been Told to Stop**

 Later that day, on July 1, 2021, at 4:48 p.m., Dr. Mirshahi sent an "impromptu" text

message, (Mirshahi Decl. ¶ 43), to Newtown Medical Director Schuele (the "Text") in which she

stated, in part:

> I have decided that I will not be micromanaged. I have decided that the handouts
>
> that I was giving out to patients about 5 months ago.
>
> The handouts that had been making my life and job a bit easier
>
> I have decided that I am going [to] resume giving them to patients

---

[13] In this email to Newtown Medical Director Schuele, Dr. Mirshahi did not complain of any remarks by any patient regarding her color, sex, or national origin.

I had been giving those handouts out for a year at that point without any issues. . .

One day when I was working at Indian river . . . one person saw them and for

reasons that I believe had more to do with control than actual concern

She took it upon herself to report to corporate and I was told to stop giving out

these very helpful tools.

     \*     \*     \*     \*

I have listened to their rules and it has made my job harder.

So I have decided I will resume to give out my handouts

     \*     \*     \*     \*

I have decided I will not be micromanaged by corporate.

     \*     \*     \*     \*

I am not interested in their theoretical problems.

This is not a request.  I am not asking for permission.

(ECF No. 49-4, at 21; Schuele Decl. ¶ 13; Mirshahi Decl. ¶¶ 43–45.)[14]

> **9.** **Per Regional Medical Director Desai's Direction, Newtown Medical Director Schuele Instructs Dr. Mirshahi to Submit Her Handouts to QIC for Approval, But Upon Further Consideration, Dr. Desai Decides to Recommend That Dr. Mirshahi's Employment Be Terminated Because of the Text**

On the same day that he received the Text, Newtown Medical Director Schuele

forwarded the Text to Regional Medical Director Desai, his supervisor.  (Schuele Decl. ¶ 14;

ECF No. 49-4, at 23, 25; Desai Decl. ¶ 7.)  In response, Regional Medical Director Desai wrote,

"No one said her [handout] was bad but there is a process involved to get forms approved.  If she

---

[14] In her deposition, Dr. Mirshahi acknowledged that the text message was "inappropriate" and described it as an "outburst."  (Mirshahi Depo., at 366:8–367:2.)

wants her form considered for approval she must have it approved by QIC, have her send the form to them for approval." (ECF No. 49-4, at 24; Schuele Decl. ¶ 15; Desai Decl. ¶ 7.) Dr. Schuele sent a text message to Dr. Mirshahi stating, "Per Dr. Desai; cc Eddie Sowe[r]s and Dr[.] Desai on your email.  Your handouts may be perfectly fine but there is a process to having them approved and you will need to submit them to the QIC for approval." (ECF No. 49-4, at 25; Schuele Decl. ¶ 16.) On July 2, 2021, Dr. Mirshahi sent an email to Drs. Schuele, Desai, Zieve, and Vice President Sowers asking for permission to use non-Patient First handouts, to which she provided links. (ECF No. 49-4, at 27; Desai Decl. ¶ 10.)

However, "[u]pon further consideration of the Text," Regional Medical Director Desai "later informed [Dr. Schuele] on approximately July 2 or 3, 2021, that he was going to recommend termination of [Dr. Mirshahi's employment] at the upcoming Regional Medical Directors meeting on July 8, 2021" because "the text [was] so egregious[.]" (Schuele Decl. ¶ 15; Desai Decl. ¶ 8–9.)  Newtown Medical Director Schuele agreed with the recommendation. (Schuele Decl. ¶ 15.)

### 10.    On July 6, 2021, Dr. Mirshahi Sends Multiple Emails Regarding Negative Patient Encounters

On July 6, 2021, at 1:31 a.m., Dr. Mirshahi sent an email to Administrative Coordinator Moore and Newtown Medical Director Schuele regarding a patient encounter that night. (ECF No. 49-1, at 31–32.)  She explained that the patient "appeared acutely intoxicated" and "became irate and aggressive demanding pain medication." (ECF No. 49-1, at 31–32.)  Dr. Mirshahi explained that when the patient "began to yell", she "no longer felt safe in the room" and exited. (ECF No. 49-1, at 32.)  Dr. Mirshahi expressed that she did "not feel it is appropriate that this

14

patient be allowed to return to Patient [F]irst for further care." (ECF No. 49-1, at 32; *see also* Schuele Decl. ¶ 10.)[15]

At 9:52 a.m., also on July 6, 2021, Dr. Mirshahi sent a second email to Administrative Coordinator Moore, copying Administrative Assistant Bass, "[r]egarding a patient seen at Newtown today." (ECF No. 49-1, at 30.) Dr. Mirshahi recounted that she "gave [the patient her] medical opinion" and the patient "tried to argue" with her, stating, "'I know my body.'" (ECF No. 49-1, at 30.) Dr. Mirshahi wrote, "I believe I have been dealing with ageism, sexism and racism here" and that "I no longer will stand in rooms and deal with people who are not medical professionals and therefore come to [Patient First] for a medical professional's advice only to reject it if it does not end with them receiving the medication they want." (ECF No. 49-1, at 30.) She further wrote, "I have been asked 'where are you from' and 'how long have you been doing this' and 'how old are you anyway' more times than I can count"[16] and that "[t]hese questions are asked often after I decline to give the patient medication that they want and often ask for by name." (ECF No. 49-1, at 31.) She added, "I will not tolerate or encourage bad behavior from patients anymore" and "[i]t has gone on too long." (ECF No. 49-1, at 31.)[17]

---

[15] Dr. Mirshahi did not complain of any remarks by this patient related to her color, sex, or national origin.

[16] In the same email, Dr. Mirshahi wrote, "These patients are few and far between, thank goodness." (ECF No. 49-1, at 31.)

[17] During her deposition, Dr. Mirshahi described how "during the COVID pandemic", patients experienced delays and some became angry. (Mirshahi Depo., at 212:2–7.) She stated that "some of these patients . . . would start to say things about my national origin, gender, and so." (Mirshahi Depo., 212:10–12.) She further stated that "several" patients "would say . . . things that would be along lines of 'Oh, you're a diversity hire, not a good doctor.' 'You don't know what you're doing.'" (Mirshahi Depo., at 213:16–19.) Dr. Mirshahi further recounted that patients would say "'Iranians are . . . not modern people'" and "'they probably don't have real doctors, real [] hospitals, and things like that.'" (Mirshahi Depo., at 214:2–5; 215:15–21.) These specific allegations are absent from the Amended Complaint. (*See generally* ECF No. 6.)

**11.    The Agenda for the Regional Medical Directors July 8, 2021 Meeting before which Dr. Desai Sends to Vice President Sowers the Text From Dr. Mirshahi to Dr. Schuele**

That same day, Administrative Assistant Bass forwarded Dr. Mirshahi's July 6 email regarding the negative patient interaction to Vice President Sowers. Vice President Sowers responded, "She's crazy . . . thanks for sharing. I will pass this along." (ECF No. 55-1, at 1 (ellipses in original).) On the same day, Vice President Sowers forwarded the email chain to Regional Medical Director Desai, Patient First Chief Medical Director Dr. Yoon, and Patient First President George Morison, stating: "I have added this to Thursday's meeting." (ECF No. 49-1, at 30.)

On July 7, 2021, Regional Medical Director Desai responded to Vice President Sowers, copying Dr. Yoon and President Morison, stating: "Agree, let's discuss her situation further. Here's a recent 'text' Dr. Schuele received from her in regards to another subject matter." (ECF No. 49-1, at 37, 47; Desai Decl. ¶ 13; Sowers Decl. ¶ 28.) President Morison responded to Regional Medical Director Desai's email, writing, "I am speechless." (ECF No. 49-1, at 47.) Vice President Sowers forwarded the email containing Dr. Mirshahi's text to Director of Physician Relations Green, and Patient First's Recruiting Coordinator, Eleanor Hertzler, writing, "Fyi . . . I am not sure we can keep her much longer."[18] (Sowers Decl. ¶ 30.) Director of Physician Relations Green responded, "She needs to go. We can figure something out on the schedule." (ECF No. 49-1, at 37; ECF No. 49-14 ("Green Decl.") ¶ 8.)

---

[18] Vice President Sowers avers that on July 7, 2021, the day he became aware of Dr. Mirshahi's text, he "decided that [Dr. Mirshahi] needed to be terminated because of the Text and her stated willful disregard for Patient First, our polices, and the Agreement[.]" (Sowers Decl. ¶ 32.)

**12.    During the July 8, 2021 Regional Medical Directors Meeting, Vice President Sowers Communicates His Decision That Dr. Mirshahi's Employment Needed to be Terminated Because of the Text**

The next day, at the Regional Medical Directors meeting on July 8, 2021, Vice President Sowers "raised the issue of termination and stated that [Dr. Mirshahi] needed to be terminated because of the Text." (Sowers Decl. ¶ 33; Desai Decl. ¶ 14.)  In addition to Vice President Sowers, the meeting was attended by Patient First's President George Morison, Chief Medical Director Yoon, and Regional Medical Director Desai.  (Sowers Decl. ¶¶ 2, 4, 19, 33; Desai Decl. ¶ 2; ECF No. 49-13 ("Morison Decl.") ¶ 13.)  At the meeting, "[n]o other reasons for [Dr. Mirshahi's] termination were offered or discussed by anyone." (Sowers Decl. ¶ 33; Desai Decl. ¶ 14.)  Vice President Sowers "was the decisionmaker in regard to [Dr. Mirshahi's] termination, with input from Mr. Morison and Ms. Green."[19] (Sowers Decl. ¶ 39.)  The other individuals at the meeting did not object to Vice President Sowers's conclusion and "all present agreed with the decision." (Sowers Decl. ¶ 33; Morison Decl. ¶ 13.)

"Dr. Desai was given the discretion, in terms of timing, to inform [Dr. Mirshahi], so long as it occurred by the end of July 2021." (Sowers Decl. ¶ 33; Desai Decl. ¶ 15.)  Under the Physician Employment Agreement, Dr. Mirshahi would be given sixty days' notice of her termination, during which period she would not work.  (Sowers Decl. ¶ 33.)  "On July 8, 2021 . . . after the Regional Medical Directors meeting, [Dr. Desai] told [Newtown Medical Director Schuele] that [Dr. Mirshahi] was going to be terminated because of the Text." (Schuele Decl. ¶ 18.)  Regional Medical Director Desai asked Newtown Medical Director Schuele if he would

---

[19] Ms. Green, Patient First's Director of Physician Relations, was not present at the Regional Medical Directors meeting on July 8, 2021.  (Green Decl. ¶ 2; Sowers Decl. ¶ 33.)  However, Mr. Sowers communicated with Ms. Green about the Text on July 7, 2021.  (Sowers Decl. ¶ 32; Green Decl. ¶ 5.)  Mr. Sowers separately communicated with President Morison regarding the Text on the same day.  (Sowers Decl. ¶ 32; Morison Decl. ¶ 9.)

like to be present when Dr. Mirshahi was informed of the termination of her employment, which would occur by the end of July 2021. (Schuele Decl. ¶ 18.) Dr. Schuele said yes. (Schuele Decl. ¶ 18.)

### 13.    Newtown Medical Director Schuele Speaks to Dr. Mirshahi about Her Tardiness

On July 8, 2021, Newtown Medical Director Schuele "spoke with [Dr. Mirshahi] . . . to discuss her frequent tardiness."[20] (Schuele Decl. ¶ 20.) Dr. Mirshahi told Dr. Schuele "that her tardiness was attributable to, among other things, the time it took her to put on her personal protective equipment" and that "sometimes she was so anxious about coming into the center that she sat in her car in the parking lot not wanting to leave her vehicle." (Schuele Decl. ¶ 20.) Dr. Mirshahi also told Dr. Schuele "that sometimes when she did not provide patients the medications they wanted, or they disagreed with her treatment plan, they said mean things to her." (Schuele Decl. ¶ 20.)

The next day, on July 9, 2021, Dr. Mirshahi sent Newtown Medical Director Schuele an email following up on their conversation the previous day to "reiterate a few points." (Schuele Decl. ¶ 21; ECF No. 49-4, at 29–31.) Dr. Mirshahi wrote that "'people will look at [her] as a relatively young woman of color,' and she 'believed' that 'ageism is more the root of the issue than sexism or racism but for whatever reason there are some patients who will insist and demand. . .'"[21] (ECF No. 49-4, at 29; Schuele Decl. ¶ 21.) She then described a situation in

---

[20] It is unclear whether this conversation with Dr. Mirshahi happened before or after Regional Medical Director Desai informed Dr. Schuele that Dr. Mirshahi was going to be terminated because of the Text. (*See* Sowers Decl. ¶¶ 18, 20.)

[21] Newtown Medical Director Schuele asserts that Dr. Mirshahi "did not tell [Dr. Schuele] that she believed patients viewed her or treated her differently because of her age, gender, or color, until either [their] conversation of July 8 or her email of July 9, 2021."

which a patient had gotten angry with her for asking them questions to determine how to best help them, writing, "I am traumatized when these patients treat me badly for caring. And then I am traumatized again when I have to explain why the patient has complained." (ECF No. 49-4, at 30.) Dr. Mirshahi clarified that, "If I make a medically unsound decision or if I am medically negligent, I would expect and fully understand having to deal with the complaint." (ECF No. 49-4, at 30.) She provided examples of such complaints, including a "young man with lymphoma whose diagnosis I missed", "a pregnant woman to whom I prescribed Doxycycline", and "when I prescribed a woman a course of narcotics that was longer than the recommended period." (ECF No. 49-4, at 30.)

On July 12, 2021, Regional Medical Director Desai and Newtown Medical Director Schuele exchanged text messages. (Schuele Decl. ¶ 23; ECF No. 49-4, at 35.) Dr. Schuele "noted '75 days,' referring to the approximate number of days [Dr. Mirshahi] would remain on the payroll." (Schuele Decl. ¶ 23; *see also* ECF No. 49-4, at 35; Desai Decl. ¶ 16.) Dr. Desai responded, "'Maybe sooner if she keeps this up,' referring to [Dr. Mirshahi] being a 'no show' that morning." (Schuele Decl. ¶ 23; *see also* ECF No. 49-4, at 35; Desai Decl. ¶ 16.)

Dr. Mirshahi was out of the office on leave to recover from an illness for ten days beginning on July 13, 2021. (ECF No. 59-1, at 12; Mirshahi Decl. ¶ 69.) On approximately July 13, 2021, Newtown Medical Director Schuele created the next month's schedule, listing Dr.

---

(Schuele Decl. ¶ 21.) He adds that "[b]y that time, the decision to terminate [Dr. Mirshahi] had already been made." (Schuele Decl. ¶ 21.)

To the extent a genuine dispute exists regarding when Dr. Mirshahi told Dr. Schuele she believed patients viewed or treated her differently because of her age, gender, or color, such a dispute would be immaterial. The Court's conclusion below regarding Dr. Mirshahi's failure to state a prima facie case of race, sex, or national origin discrimination does not rely on when Dr. Mirshahi informed Dr. Schuele of alleged discriminatory treatment or comments by *patients*.

Mirshahi as working in August 2021, "even though at that time [he] knew she was terminated."
(ECF No. 59-3, at 4, 6.)  In consultation with Regional Medical Director Desai, Dr. Schuele took
this action so it would not "be obvious that she [was] to be terminated."  (ECF No. 59-3, at 4.)
Dr. Schuele subsequently went on vacation and returned on July 28, 2021.  (ECF No. 59-1, at
12–13.)

###        14.      Regional Medical Director Desai and Newtown Medical Director Schuele Inform Dr. Mirshahi of the Termination of Her Employment

"On July 28, 2021, [Regional Medical Director] Dr. Desai and [Newtown Medical
Director Schuele] met with and informed [Dr. Mirshahi] of her termination."  (Schuele Decl. ¶
25; *see also* Desai Decl. ¶ 18.)  Dr. Mirshahi explains that she was "very upset at the meeting and
was crying" and "might have" raised her voice. (Mirshahi Decl. ¶ 75; Mirshahi Depo., 386:16–
20.)  However, she "listened to everything that was said during the meeting by both Dr. Desai
and Dr. Schuele, and neither one of them said anything to . . . suggest that my Text from July 1,
2021 was the basis for my termination."[22]  (Mirshahi Decl. ¶ 75.)  "[Dr. Desai] confirmed to [Dr.
Mirshahi] in an email later [that day] that she was terminated."  (Desai Decl. ¶ 19; ECF No. 49-7,

---

[22] Drs. Desai and Schuele assert that Regional Medical Director Desai told Dr. Mirshahi
that the Text was the reason for her termination, "but the scene was so chaotic that [Dr.
Mirshahi] may not have heard him."  (Schuele Decl. ¶ 25; Desai Decl. ¶ 18.)  To the extent a
genuine dispute exists regarding whether Drs. Desai or Schuele told Dr. Mirshahi in the July 28,
2021 meeting that the reason for her termination was the Text, such a dispute would be
immaterial.

The Court's conclusion below regarding Dr. Mirshahi's failure to state a prima facie case
for color, sex, or national origin discrimination does not rely on verbal statements made by Drs.
Desai or Schuele, who, in any event, were not decisionmakers regarding the termination of Dr.
Mirshahi's employment.  Dr. Mirshahi does not dispute that "[Vice President] Sowers had . . .
the unilateral authority to terminate a physician."  (ECF No. 49, at 3; ECF No. 55, at 21.)  The
undisputed record before this Court, even read favorably, establishes that Vice President Sowers
made the decision to terminate Dr. Mirshahi's employment.

at 29.) Dr. Desai wrote, "as we discussed it just doesn't seem like Patient First is the right fit[.]" (ECF No. 49-7, at 29.)

Also on July 28, 2021—the same day Drs. Desai and Schuele met with Dr. Mirshahi in person—Dr. Mirshahi and Vice President Sowers exchanged several emails regarding the termination of Dr. Mirshahi's employment. (Sowers Decl. ¶ 35.) Vice President Sowers, "the decisionmaker in regard to [Dr. Mirshahi's] termination," (Sowers Decl. ¶ 39), explained to Dr. Mirshahi that the decision to terminate her employment "has to do with the fact that you have openly refused to comply with Patient First policies and procedures by providing patients with non-approved clinical instructions." (ECF No. 49-1, at 60.) He recounted that "Dr. Desai asked you to stop and to use the Patient First [Quality Improvement Committee] approved patient instructions." (ECF No. 49-1, at 60.) However, he noted that "[a]fter Dr. Desai addressed this issue and shared an avenue through which you could get your instructions approved[23] . . . you sent a text to Dr. Schuele in which you wrote that you were going to commence handing out your instructions and that you, 'would not be micromanaged by corporate'" and stated that "'this is not a request. I am not asking for permission.'" (ECF No. 49-1, at 60.) Vice President Sowers further wrote that "we just can't keep someone on who openly refuses to follow our standard

_____

[23] While it is undisputed that Vice President Sowers stated this in his email, the record is unclear regarding whether Nurse Swanner in fact communicated Dr. Desai's instruction that Dr. Mirshahi could "submit the forms to QIC for approval, if she feels strongly about the forms" to Dr. Mirshahi. (ECF No. 49-7, at 8.) It is undisputed that Nurse Swanner communicated Regional Medical Director Desai's instruction to Dr. Mirshahi that she stop distributing her self-made handouts, explaining, "[I]t's against policy . . . to have these types of handouts and give them out to patients." (Mirshahi Depo., at 302:1–10; 319:12–320:2; Mirshahi Decl. ¶ 16.) However, viewing the record in the light most favorable to Dr. Mirshahi, as the Court must, the Court makes the reasonable inference that Nurse Swanner did not communicate Dr. Desai's instruction that Dr. Mirshahi submit her forms to QIC for approval. This must be read favorably even though Dr. Mirshahi communicated with Specialist Stevens about the QIC process later that day. (Mirshahi Decl. ¶¶ 23–24.)

procedures" and that "[y]our text to Dr. Schuele about continuing to give patients your instructions and willfully ignoring our policy was the reason for the decision." (ECF No. 49-1, at 59, 61.)

Dr. Mirshahi's "last day on the Patient First payroll was September 26, 2021." (Sowers Decl. ¶ 42.)

## B.    <u>Procedural Background</u>

On August 7, 2023, Dr. Mirshahi filed a Complaint, naming Patient First as the sole defendant and included two counts: a Title VII Discrimination claim and a Virginia Human Rights Act ("VHRA") claim. (ECF No. 1, at 4–5.) On November 17, 2023, before Patient First had filed an answer or otherwise responded, Dr. Mirshahi properly filed a five-count First Amended Complaint, adding Newtown Medical Director Schuele and Nurse Cericola as defendants and bringing the following five causes of action:

**Count I:**    *Bowman* Claim[24] (against Patient First and Dr. Schuele)

**Count II:**    Virginia Whistleblower Protection Act ("VWPA") Claim (against Patient First)

**Count III:**    Title VII Discrimination Claim (Color, Sex, and National Origin) (against Patient First)

**Count IV:**    VHRA Discrimination Claim (Color, Sex, and National Origin) (against Patient First)

**Count V:**    Defamation (against Nurse Cericola and Patient First)

(ECF No. 6, at 20–25.)

On January 23, 2024, Patient First, Nurse Cericola, and Newtown Medical Director Dr. Schuele filed a Partial Motion to Dismiss and Motion to Strike (the "Partial Motion to Dismiss"),

---

[24] "*Bowman* Claim" refers to *Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985). (ECF No. 6, at 20 n.5.) *Bowman* established a "narrow exception" to Virginia's at-will

moving to dismiss Counts I, II, and V of the First Amended Complaint.  (ECF No. 11, at 1.)  On

August 13, 2024, this Court granted the Partial Motion to Dismiss, dismissing with prejudice

Counts I, II, and V and dismissing Dr. Schuele and Nurse Cericola from this action.  (ECF No.

24, at 1.)  On September 6, 2024, Patient First filed an Answer.  (ECF No. 27.)

On March 18, 2025, Patient First filed a Motion for Summary Judgment, contending that

it is entitled to summary judgment on Counts III and IV in Plaintiff's First Amended Complaint,

the only counts that remain pending before the Court.  (ECF No. 48, at 2; ECF No. 49.)  Dr.

Mirshahi responded, (ECF No. 55), and Patient First replied, (ECF No. 59).  For the reasons

articulated below, the Court will grant the Motion for Summary Judgment.

### II.  Standard of Review:  Summary Judgment

Summary judgment under Federal Rule of Civil Procedure 56[25] is appropriate only when

the Court, viewing the record as a whole and in the light most favorable to the nonmoving party,

determines that there exists no genuine issue of material fact and that the moving party is entitled

to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  Once a party has properly filed

_____

employment doctrine, holding that an at-will employee's discharge is wrongful when it occurs
"in violation of an established public policy."  331 S.E.2d at 801.

[25] Rule 56(a) provides:

> (a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT.  A
> party may move for summary judgment, identifying each claim or defense — or
> the part of each claim or defense — on which summary judgment is sought.  The
> court shall grant summary judgment if the movant shows that there is no genuine
> dispute as to any material fact and the movant is entitled to judgment as a matter
> of law.  The court should state on the record the reasons for granting or denying
> the motion.

Fed. R. Civ. P. 56(a).

evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24. These facts must be presented in the form of stipulations, exhibits, and sworn affidavits or declarations. Fed. R. Civ. P. 56(c).[26] Moreover, the facts offered by a sworn declaration must also be in the form of admissible evidence, meaning the statements in the sworn declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party

---

[26] Rule 56(c) states, in pertinent part:

(c) PROCEDURES.

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, stipulations (including those made for purposes of the motion only), . . . or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

is entitled 'to have the credibility of [its] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). However, "'there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed.'" *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). Thus, "the nonmoving party must rely on more than conclusory allegations, 'mere speculation,' the 'building of one inference upon another,' the 'mere existence of a scintilla of evidence,' or the appearance of 'some metaphysical doubt.'" *Lamar v. Ebert*, No. 2:12cv706 (HCM), 2018 WL 11463829, at \*3 (E.D. Va. Mar. 20, 2018) (quoting *Anderson*, 477 U.S. at 252; *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 330 F. Supp. 2d 688, 671 (E.D. Va. 2004)).

At this stage, the Court is tasked with assessing whether a plaintiff "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323–24).

### III.  Analysis

Dr. Mirshahi brings Count III under Title VII of the Civil Rights Act ("Title VII") and Count IV under the Virginia Human Rights Act ("VHRA"), claiming that Patient First discriminated against her and terminated her employment due to her color, sex, and national origin.  (ECF No. 6, at 22–24.)  Patient First moves for summary judgment on both of these remaining claims against it.  (ECF No. 48.)

The Court concludes that Dr. Mirshahi has failed to establish even a prima facie case that Patient First discriminated against her based on her color, sex, or national origin, or that her color, sex, or national origin played any role in Patient First's decision to terminate her employment.  Even viewing the record as a whole and in the light most favorable to Dr. Mirshahi, no evidence stands before the Court from which a reasonable jury could find that Patient First discriminated against her or that her color, sex, or national origin played any role in her termination.  Dr. Mirshahi therefore does not present a genuine issue of material fact sufficient to sustain a discrimination claim against Patient First.  For the reasons articulated below, the Court will grant the Motion for Summary Judgment.  (ECF No. 48.)

### A.    Legal Standard:  Discrimination Under Title VII and the VHRA

"Title VII makes it unlawful for an employer to discriminate against an individual on the basis of race or sex, among other protected categories." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 254–55 (4th Cir. 2025) (citing 42 U.S.C. § 2000e *et seq.*).  The VHRA is "Virginia's state law analogue to Title VII." *Desai v. DeJoy*, No. 1:22cv846 (RDA), 2024 WL 3092403, at *9 (E.D. Va. June 20, 2024) (citing *Puryear v. Cnty. of Roanoke*, 214 F.3d 514, 522 n.13 (4th Cir. 2000) (stating that the VHRA explicitly incorporates federal anti-discrimination law).  To prevail on a discrimination claim under Title VII or the VHRA, a plaintiff must show

26

that his or her protected characteristic was a "motivating factor" behind the decision causing his or her injury. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020) (discussing Title VII's "motivating factor" test); Va. Code § 2.2-3905(B)(6)[27] (it is "an unlawful discriminatory practice" to consider a protected characteristic "as a motivating factor for any employment practice".)

Where a plaintiff lacks direct evidence of discrimination, he or she may prove discrimination "through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*[.]" *Wannamaker-Amos*, 126 F.4th at 255 (citing 411 U.S. 792 (1973)). "To establish a prima facie case of discrimination, 'a plaintiff must show that (1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination.'" *Id.* (quoting *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021)).

If a plaintiff establishes a prima facie case of discrimination, a defendant may then rebut this prima facie case by identifying legitimate, nondiscriminatory reasons for the plaintiff's adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142

---

[27] Va. Code § 2.2-3905(B) provides, in pertinent part:

B. It is an unlawful discriminatory practice for:

\*       \*       \*

6. Except as otherwise provided in this chapter, an employer to use race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions, age, military status, disability, or ethnic or national origin as a motivating factor for any employment practice, even though other factors also motivate the practice.

Va. Code § 2.2-3905(B)(6).

(2000). Only after this showing may a plaintiff present an argument that the reasons a defendant provided were in fact pretextual. *Id.* at 143. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. "Although intermediate evidentiary burdens shift back and forth under this framework", the burden of persuasion "'remains at all times with the plaintiff.'" *Id.* (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

### B.    Dr. Mirshahi Has Failed to Establish a Prima Facie Case of Discrimination

"To establish a prima facie case of discrimination, 'a plaintiff must show that (1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination.'" *Wannamaker-Amos*, 126 F.4th at 255 (citation omitted). Here, Dr. Mirshahi has failed to show that the adverse action—the termination of her employment at Patient First— "occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Id.* Because she fails to satisfy the fourth prong of the *McDonnell Douglas* test,[28] she fails to establish a prima facie case of discrimination.

---

[28] Because Dr. Mirshahi clearly fails to satisfy the fourth factor in the prima facie test, the Court need not reach the other factors. However, were the Court to do so, it could likely find that Dr. Mirshahi also failed to establish the third factor—that she had been fulfilling Patient First's legitimate expectations at the time her employment was terminated. The primary basis for such a finding would be the July 1, 2021 Text she sent to her direct supervisor, in which she stated that she had "decided [she] will resume to give out [her] handouts", despite acknowledging she had been "told to stop giving [them] out." (ECF No. 49-4, at 21.) She further stated, "I have decided I will not be micromanaged by corporate" and "[t]his is not a request. I am not asking for permission." (ECF No. 49-4, at 21.)

Dr. Mirshahi asserts that "a genuine dispute of material fact exists as to whether Patient First terminated [her] based on intentional color and national origin discrimination" for two reasons. (ECF No. 55, at 24.) First, she asserts that Dr. Mirshahi's "color and national origin were expressly on the agenda for the July Regional Directors Meeting where Patient First decided to terminate her" and that "Patient First showed open animus towards [Dr. Mirshahi's] protected characteristics." (ECF No. 55, at 25.) In support of this, Dr. Mirshahi cites her July 6, 2021 email to Administrative Coordinator Moore, "which specifically talked about patients asking her where she was 'from[.]'" (ECF No. 55, at 24–25 (referring to ECF No. 49-7, at 17).) In response to this email, Vice President Sowers wrote, "I have added this to Thursday's meeting." (ECF No. 49-7, at 16.) Dr. Mirshahi's asks the Court to infer from this email that her "color and national origin were expressly on the agenda for the July Regional Directors Meeting." (ECF No. 55, at 25.)

The Court declines to do so, concluding that a more reasonable inference from this email is that Dr. Mirshahi's *complaints* of "dealing with ageism, sexism and racism"—rather than her color or national origin itself—were to be discussed at the meeting.[29] (ECF No. 49-7, at 17.) This inference is further buttressed by Dr. Mirshahi's allegation that *patients*, not Patient First employees, were making discriminatory complaints against her.

---

As noted earlier, Dr. Mirshahi concedes that the Text was "inappropriate" and describes it as an "outburst." (Mirshahi Depo., at 366:8–367:2.) The existence of the Text and other undisputed evidence, including Newtown Medical Director Schuele's concerns about her efficiency and patient wait times, (ECF No. 55-4, at 3), the Court might be able to conclude that Dr. Mirshahi failed to establish the third *McDonnell Douglas* factor. But it need not for purposes of this decision.

[29] Indeed, a reasonable inference from Vice President Sowers's email could be that Dr. Mirshahi's allegations of discrimination by patients were placed on the agenda to discuss how to support Dr. Mirshahi.

As support for her assertion that "Patient First showed open animus towards [her] protected characteristics", Dr. Mirshahi first cites Vice President Sowers's email response to Ms. Bass's forwarding of the same July 6, 2021 email from Dr. Mirshahi. (ECF No. 55, at 25.) Vice President Sowers responded to Ms. Bass, "She's crazy . . . thanks for sharing. I will pass this along." (ECF No. 55-1, at 1 (ellipses in original).) Vice President Sowers's comment that Dr. Mirshahi is "crazy", while insulting, remains facially neutral respecting color, sex, and national origin. Courts have repeatedly held that insulting but race-neutral language does not give rise to an inference of discrimination. *See King v. Eastern Shore Water, LLC*, No. SKG-11-1482, 2012 WL 3155647, at *12 (D. Md. July 31, 2012) (finding that "[w]hile perhaps harsh, offensive, and insulting, nothing indicates that [] race-neutral comments/actions were discriminatory in any way"); *Risby v. Nielsen*, 768 F. App'x 607, 611 (9th Cir. 2019) (concluding that a statement "that Plaintiff is 'crazy' does not give rise to an inference that [the employer] discriminated against Plaintiff because of a physical disability, race, or EEO activity"). While offensive, Vice President Sowers's email response to Ms. Bass referring to Dr. Mirshahi as "crazy" does not show "open animus" based on her color, sex, or national origin.

Second, Dr. Mirshahi asserts that "a genuine dispute of material fact exists as to whether Patient First terminated [her] based on intentional color and national origin discrimination" because "Dr. Mirshahi was treated differently than white employees." (ECF No. 55, at 24, 27.) She asserts two justifications for this assertion. Dr. Mirshahi identifies Ellen Montgomery, "a white physician's assistant who worked at a Patient First facility in Tidewater" who "allegedly engaged in insubordinate and 'defiant' behavior by cussing out her Medical Director, leaving the location without permission, and refusing to meet with her Medical Director" and was not disciplined. (ECF No. 55, at 18; ECF No. 55-19 ("Thompson Depo."), at 12:1–13:19.)

However, to satisfy the fourth *McDonnell Douglas* factor by identifying a comparator, a plaintiff must "provide evidence that the proposed comparators are not just similar in some respects, but 'similarly-situated *in all respects.*'" *Cosby v. S.C. Probation, Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (quoting *Spencer v. Va. State. Univ.*, 919 F.3d 199, 207–08 (4th Cir. 2019) (emphasis in original)). "[T]he plaintiff must prove that she and the comparator 'dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019)).

Ellen Montgomery was supervised by Dr. Thompson, whereas Dr. Mirshahi was supervised by Newtown Medical Director Schuele. Ms. Montgomery and Dr. Mirshahi were not subject to the same standards, because Ms. Montgomery was a physician's assistant, whereas Dr. Mirshahi was a doctor. Finally, the two individuals did not engage in the same conduct. Ms. Montgomery said to Dr. Thompson, "[d]on't you ever f***ing do that to me again", (Thompson Depo., at 13:3–4), whereas Dr. Mirshahi sent Newtown Medical Director Schuele a text message advising him that she had "decided [to] resume giving [her handouts] to patients" in violation of Patient First policy despite having been "told to stop". (ECF No. 49-4, at 21.) Given these differences, Ms. Montgomery cannot serve as a valid comparator and this evidence does not create a genuine dispute of fact as to whether Patient First unlawfully discriminated against Dr. Mirshahi.

Third, Dr. Mirshahi asserts that a genuine dispute exists because she "was replaced by . . . two white physicians"—Drs. Elliot and Scanlan. (ECF No. 55, at 28.) However, Dr. Mirshahi has failed to refute Patient First's evidence that Dr. Elliot was already working at Patient First's

31

Newtown location when Dr. Mirshahi began her employment in February 2019.  (Sowers Decl.

¶¶ 13–14.)  Indeed, Dr. Mirshahi has not rebutted Patient First's assertion that "Dr. Elliot went

out on medical leave in late January 2021" but returned from leave "in September 2021."

(Sowers Decl. ¶ 14; ECF No. 59-5 ("Second Sowers Decl.") ¶ 6.)

Patient First also presented evidence that "Dr. Paul Scanlan [] was already employed by

Patient First at the Denbeigh Medical Center since March 2021" and "occasionally covered shifts

at Newtown" from September to December of 2021.  (Second Sowers Decl. ¶ 7.)  "In April

2022, Dr. Scanlan began working full-time at Newtown after he asked to transfer there from the

Denbeigh Center."  (Second Sowers Decl. ¶ 12.)  Dr. Mirshahi's assertion that schedule

documents "show that [Dr. Scanlan] started working regularly at Newtown beginning in October

of 2021", (ECF No. 55, at 19–20), is not materially inconsistent with Patient First's assertion that

Dr. Scanlan "occasionally covered shifts at Newtown."[30]  (Second Sowers Decl. ¶ 7.)  Further,

"[t]ransfer of work by a terminated employee to other employees does not constitute

'replacement' in an employment discrimination context."  *Ruddy v. Bluestream Pro. Serv., LLC*,

444 F.Supp.3d 697, 708 n.23 (E.D. Va. 2020) (internal quotation marks omitted); *see also Lilley

v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated

employee among the remaining employees does not constitute replacement" of a terminated

employee).  Therefore, Dr. Mirshahi has not shown that she was replaced by Dr. Elliot or Dr.

Scanlan.

Even viewing the record as a whole and in the light most favorable to Dr. Mirshahi, *see

Celotex Corp.*, 477 U.S. at 322–24 *and Anderson*, 477 U.S. 248–50, Dr. Mirshahi has failed to

---

[30] The scheduling documents to which Dr. Mirshahi refers show that Dr. Scanlan worked two shifts in October 2021, three shifts in November 2021, and six shifts in December 2021. (ECF No. 55-24, at 2–4.)

adduce any evidence that would allow a reasonable factfinder to conclude that Patient First

considered Dr. Mirshahi's color, sex, or national origin when terminating her employment.  Nor

does she identify any other circumstances that could give rise to an inference of color, sex, or

national origin discrimination.  Because Dr. Mirshahi fails to satisfy the fourth prong of the

*McDonnell Douglas* framework, she does not establish a prima facie case of race discrimination.

Having concluded that Dr. Mirshahi cannot make this prima facie showing, the Court must

dismiss her discrimination claims (Counts III and IV).[31]  *See Reeves*, 530 U.S. 142 ("First, the

plaintiff must establish a prima facie case of discrimination.").

### C.    Dr. Mirshahi Cannot Show That Patient First's Reason for Terminating Her Employment—Her July 1, 2021 Text—is Pretextual

For the reasons discussed above, Dr. Mirshahi fails to establish a prima facie for her

discrimination claims because, even viewing the record as a whole and in the light most

favorable to her, she cannot show that Patient First discriminated against her based on her color,

sex, or national origin.  Even if the Court were to conclude otherwise (which it does not), these

claims would founder because Dr. Mirshahi fails to show that Patient First's reason for

terminating her employment—the July 1, 2021 Text she sent to Dr. Schuele—is pretextual.  The

undisputed evidence shows that the Text was the reason for Dr. Mirshahi's termination.

Dr. Mirshahi asserts that "the record easily shows that Patient First's reason for

terminating [her] was a pretext for unlawfully discriminating against her based on color and

national origin."  (ECF No. 55, at 29.)  In support of this assertion, Dr. Mirshahi states that

"Patient First . . . didn't tell Dr. Mirshahi that she was being terminated based on the Text in the

---

[31] As explained *supra*, the VHRA is "Virginia's state law analogue to Title VII."  *Desai v. DeJoy*, No. 1:22cv846 (RDA), 2024 WL 3092403, at *9 (E.D. Va. June 20, 2024) (citing *Puryear v. Cnty. of Roanoke*, 214 F.3d 514, 522 n.13 (4th Cir. 2000) (stating that the VHRA explicitly incorporates federal anti-discrimination law).

July 28, 2021 meeting[.]" (ECF No. 55, at 30.) Rather, she asserts that during the July 28, 2021 meeting, Drs. Desai and Schuele raised issues with patient complaints and tardiness before "shift[ing] gears" and stating that she "was an 'at will' employee and could be fired for any reason." (Mirshahi Decl. ¶ 74.) For their part, Drs. Desai and Schuele assert that Regional Medical Director Desai told Dr. Mirshahi that the Text was the reason for her termination, "but the scene was so chaotic that [Dr. Mirshahi] may not have heard him." (Schuele Decl. ¶ 25; Desai Decl. ¶ 18.) As discussed *supra*, to the extent there is a genuine dispute regarding whether Dr. Desai or Dr. Schuele told Dr. Mirshahi in the July 28, 2021 meeting that the reason for her termination was the Text, such a dispute would be immaterial. Importantly, she does not dispute that Vice President Sowers told her that the Text was the basis for the termination of her employment on the same day as her in-person meeting with Drs. Desai and Schuele.

In Dr. Mirshahi's July 1, 2021 Text to her direct supervisor, Newtown Medical Director Schuele, she stated that she had "decided [she] will resume to give out [her] handouts", despite acknowledging she had been "told to stop giving [them] out." (ECF No. 49-4, at 21.) She further stated, "I have decided I will not be micromanaged by corporate" and "[t]his is not a request. I am not asking for permission." (ECF No. 49-4, at 21.) Dr. Mirshahi admits the Text was "inappropriate" and describes it as an "outburst."[32] (Mirshahi Depo., at 366:8–367:2.) Yet she argues the Text is pretextual because "Patient First . . . didn't *act* like the Text was a big deal on July 1, 2021, July 2, 2021 or at any meaningful time thereafter." (ECF No. 55, at 30 (emphasis in original).)

---

[32] Dr. Mirshahi asserts that on April 1, 2021, she sent "samples of [her] handouts" to Specialist Stevens so that he could "pass [them] along to [Patient First's] administration for review", on April 1, but had received no response by July. (Mirshahi Decl. ¶ 25, 31.) While presumably frustrating, nothing on this record suggests that the basis for the delay stemmed from discriminatory animus.

But undisputed evidence submitted by Patient First shows that Patient First is not now "offer[ing] inconsistent post-hoc explanations for its employment decisions[.]" *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002). On the day Vice President Sowers—the undisputed decisionmaker regarding Dr. Mirshahi's termination—received a copy of Dr. Mirshahi's Text, he forwarded the email containing Dr. Mirshahi's text to Ms. Green, Director of Physician Relations, and Patient First's Recruiting Coordinator, Eleanor Hertzler, writing, "Fyi . . . I am not sure we can keep her much longer." (Sowers Decl. ¶ 30.) Ms. Green responded, "She needs to go. We can figure something out on the schedule." (ECF No. 49-1, at 37; Green Decl. ¶ 8.) Further, Patient First President Morison responded to the email, writing, "I am speechless." (ECF No. 49-1, at 47.) That Patient First did not immediately terminate Dr. Mirshahi's employment or "tell [her] contemporaneously with her Text that it was shocked by her alleged insubordination", (ECF No. 55, at 30), cannot support Dr. Mirshahi's assertion that the reason for the termination of her employment was pretextual. Rather, the undisputed evidence demonstrates that Patient First referred to and followed company protocol when discussing the process of terminating her employment. (*See, e.g.*, ECF No. 49-1, at 60–61; ECF No. 49-7, at 29.)

### IV. Conclusion

Viewing the record as a whole and in the light most favorable to Dr. Mirshahi, Dr. Mirshahi has failed to adduce evidence sufficient to create a genuine dispute of a material fact regarding her claims for color, sex, and national origin discrimination under Title VII (Count III)

and the VHRA (Count IV).  For the foregoing reasons, the Court will grant the Motion for

Summary Judgment.  (ECF No. 48.)

      An appropriate Order shall issue.

Date: 5/30/25

Richmond, Virginia

/s/

M. Hannah Lauck

United States District Judge